## In re BARTELS' ESTATE.

### JONES v. MILAM et al.

(Court of Civil Appeals of Texas. Galveston. Jan. 30, 1914. Rehearing Denied Feb. 26, 1914.)

1. Wills (§ 55*)—Testamentary Capacity—Sufficiency of Evidence.

Evidence in a will contest *held* not to sustain a finding by the jury that the testatrix did not possess testamentary capacity at the time of the execution of either of two wills.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–158, 161; Dec. Dig. § 55.*]

2. Wills (§ 1*)—Nature of Testamentary Power.

Since the right of the owner of property to dispose of it by will is often of great value, especially to those who are old and infirm and dependent upon others for services and atten-

tion, it should be as jealously guarded as any other property right.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 1; Dec. Dig. § 1.*]

3. WILLS (§ 82*)—UNEQUAL DISPOSITION.

When a will has been properly executed, it ought not to be set aside because the disposition made is unequal or unfair.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 203; Dec. Dig. § 82.*]

4. WILLS (§ 50*)—TESTAMENTARY CAPACITY—NATURE AND MEASURE IN GENERAL.

If, at the time of the execution of a will, testator did not have sufficient mental capacity to understand what he was doing, the nature and extent of his property, and the objects of his bounty, it should not be allowed to stand.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 96–100; Dec. Dig. § 50.*]

5. WILLS (§ 166*)—UNDUE INFLUENCE—EVIDENCE.

In a will contest, evidence held not sufficient to raise the issue of undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

6. WILLS (§ 55*)—TESTAMENTARY CAPACITY—EVIDENCE—INSANE DELUSION.

In a will contest, evidence held not to sustain a finding by the jury that the execution of either of two wills was the result of an insane delusion upon the part of testatrix.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–158, 161; Dec. Dig. § 55.*]

7. WILLS (§ 166*)—UNDUE INFLUENCE—EVIDENCE.

Undue influence cannot be predicated alone upon the fact that the will is unfair or unjust, and consequently unnatural, but there must be, in addition, some evidence, direct or circumstantial, that some person in a position to exercise influence over the mind of testator unduly exercised it.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

8. WILLS (§ 55*)—INSANE DELUSION—INFLUENCE ON TESTAMENTARY DISPOSITION.

Though testatrix had an insane delusion that she had been told that a daughter, whom she disinherited, would poison her, yet, as testatrix stated she did not believe it, and ate meals prepared by the daughter, the delusion could not have influenced the bequest as to the daughter.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–158, 161; Dec. Dig. § 55.*]

9. WILLS (§ 55*)—TESTAMENTARY CAPACITY—EVIDENCE.

That testatrix made an inaccurate statement in her will in giving her reason for making a bequest is no evidence of insanity or insane delusion.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–158, 161; Dec. Dig. § 55.*]

10. WILLS (§ 330*)—PROBATE—MISLEADING INSTRUCTIONS.

In a will contest, an instruction that it was incumbent upon proponent to prove to the satisfaction of the jury that testator was possessed of testamentary capacity was misleading; the requirement that, before a will can be admitted to probate, the court must be satisfied that the testator was of sound mind only affecting the sufficiency of the testimony offered by proponent when considered by itself, and does not change the rule that a jury on conflicting evidence must decide according to the preponderance of the evidence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 779–781; Dec. Dig. § 330.*]

Appeal from District Court, Harris County; Norman G. Kittrell, Judge.

Proceedings by Ira P. Jones, executor, for the probate of the will of Julia Bartels, deceased, in which Annie Milam and husband were contestants. From a judgment refusing to admit the will to probate, the executor appeals. Reversed and remanded.

L. B. Moody, of Houston, for appellant. John Lovejoy, Presley K. Ewing, and L. E. Blankenbecker, all of Houston, for appellees.

PLEASANTS, C. J. This appeal is from a judgment of the district court of Harris county refusing to admit to probate the will of Julia Bartels, deceased, offered for probate by appellant, Ira P. Jones, independent executor of said will. The probate of the will was contested by the appellee Annie Milam, a daughter of the deceased, herein joined pro forma by her husband, J. W. Milam.

The will first offered for probate was dated October 14, 1911. In reply to the contest of this will, appellant prayed, in the alternative, for the probate of a will executed July 8, 1909. Thereupon the appellees filed an amended contest, attacking both wills on the grounds that Julia Bartels was not of sound mind, and was subject to hallucinations and insane delusions, and that the said wills were the result of undue influence. Upon the hearing of the contest in the county court, it was overruled, and judgment was rendered admitting to probate the will of October 14, 1911. In the district court, to which the cause was carried by appeal, the jury found, in response to special issues, that Julia Bartels was not of testamentary capacity at the time of the making of either of said wills, and that there was undue influence brought to bear upon the mind of the testatrix, Julia Bartels, in the making of the will of October 14, 1911, and that both of the wills were the result of an insane delusion on the part of said Julia Bartels. Upon this verdict, judgment was entered refusing to probate either of said wills.

[1] The accuracy of the following summary of facts disclosed by the record, which is copied from appellant's brief, is not questioned by appellees: "Julia Bartels died in January, 1912, at the age of about 66 years. She and her husband had a vegetable stall at the market. He abandoned her about the year 1882, and left her with four small children. She took charge of the market, and made a living for her family out of it for many years, but did not accumulate any more property than she had at the time her husband left her. She was a hard worker and a woman of unusually strong mind and strong character. She had four children, viz: Annie (now Annie Milam), Julia (now Julia Sonet), Charles Bartels, and Fred Bartels. Having divided her land into lots and

blocks, she gave, by deeds, five lots to her daughter Annie, two lots to her daughter Julia, and two lots to her son Charles. She did not deed any property to Fred. The deed to Annie is dated August 14, 1897; the deed to Charles is dated April 9, 1901; and the deed to Julia is dated January 31, 1907. The son Charles drank to excess and was a spendthrift. During the last 13 years of Julia Bartels' life, Ira P. Jones was her attorney. During that time he conducted two important lawsuits for her; in one of which she recovered $4,000, and in the other she recovered the land sued for. She had a great deal of confidence in Mr. Jones, and, when she wanted legal advice, or papers drawn up in regard to property, she relied on him. On July 8, 1909, Julia Bartels, accompanied only by her little 10 year old granddaughter came to town in a buggy, which she tied across the street from Mr. Jones' office, and then came up to his office in the elevator. Mr. Jones was not in his office at the time, so she waited for him, and in the meantime talked with his stenographer, Miss Fraser. When Mr. Jones came in, she told him that she wanted him to fix up this will. She discussed its provisions with him for about three-quarters of an hour, and he then dictated the will to the stenographer, who wrote it, and it was then read over to her in the presence of the stenographer. The will carried out her wishes as she had expressed them to the stenographer and to Mr. Jones, and the will was then executed and witnessed. The will was dictated to the stenographer in Julia Bartels' presence, and its contents was the result of suggestion wholly on her part. She then left the office and untied her horse, got into the buggy and drove off. By this will she bequeathed to the three children of her daughter Annie the sum of $500 each, and to her daughter Annie the sum of $5, coupled with the statement that she had previously given her money and property more than she had any other child. The remainder of her estate she divided among her three other children. A little more than two years later, Annie Milam (the contestant) telephoned Mr. Jones that her mother wanted to make another will, and for him to come over and draw it up. Mr. Jones asked Mrs. Milam whether it was urgent for him to come at once, and she said that it was not necessary for him to come immediately; so several days later he went to Mrs. Milam's house, who directed him to where her mother was living, which is across the street, and told him that her mother was expecting him. Mr. Milam then went over to Mrs. Bartels' with Mr. Jones, and then returned to his home. Mrs. Bartels then told Mr. Jones that she wanted to have her will rewritten, and he asked her how she wanted to make it, and she said: "You made a will for me something over two years ago, and I want to make it like that will, with the exception that I want to give my daughter Annie $500, instead of $5, as I had in the previous will." Then she stated that she wanted to give Cetilia Sonet (a granddaughter) a certain house and lot, and that she wanted Fred to have the old homestead, and all of her personal property, household and kitchen furniture, live stock, etc. She then discussed at some length the appointment of a trustee for her spendthrift son, and requested Mr. Jones to act as executor. During the following week, Mr. Jones again went to see Mrs. Bartels, taking with him a draft of the proposed will, and read it over to her. She at once called his attention to the fact that he had left out the personal property for Fred Bartels, and that he had made the will to read that the bequest of the house and lot to Cetilia Sonet was an independent bequest, and that the old home was an independent bequest to Fred Bartels, and she said that that was not the way she intended; that she wanted the bequest to Cetilia Sonet to come out of her mother's part, and she wanted Fred to be charged with the homestead as a part of his share. These three things were the only things that he had not gotten right, and she called his attention to each one of them. In the course of the next week, he drew up the will again, and then he went over to her house the third time and read it over to her, and she said it was correct, and that he then understood her and had everything there the way she wanted it. She then requested him to get two witnesses to come with him to her house, so that she could execute the will. He did so, and the will was then read over to her again, in the presence of the witnesses, and was executed by her and signed by them. In discussing the provisions of this will with her, she made this statement in reference to Mrs. Milam: "In my previous will I gave Annie only $5. Annie has been a little better to me lately then heretofore, and I want to increase her bequest to $500." After the will was read and explained by Mr. Jones, she said: "I thank you, that is just what I wanted; that is right."

The only differences between the will of July 8, 1909, and the will of October 14, 1911, are that in the first will only $5 was bequeathed to Annie Milam, while in the last will she was given $500; in the first will Cetilia Sonet is not mentioned, while in the last will she was given a house and lot, the same to be subtracted from her mother's share; in the last will her live stock, household and kitchen furniture, and wagons are specifically bequeathed to Fred Bartels, whereas this personal property is not mentioned in the first will; in the last will her old homestead is specifically devised to Fred Bartels, to be taken as a part of his share of the estate, whereas, in the first will the old homestead is not mentioned; in the first

will Fred Bartels is made trustee for the share of Charles Bartels, whereas in the last will the Houston Land & Trust Company is substituted as trustee instead of Fred Bartels; and in the last will it is provided that, if any of the devisees contest it, they shall receive no part of the estate, whereas no such provision was contained in the first will. With the above exceptions, the two wills are identical in their provisions.

The statements above set out as to the directions given by Mrs. Bartels in regard to the changes in the will of October 14, 1911, are only shown by the testimony of Mr. Jones, who, as before stated, is named as the executor in both wills. The will of July 8, 1909, was witnessed by Miss N. L. Fraser and Ira P. Jones, Jr., both of whom were competent witnesses, and both testified that they signed the will as witnesses at the request of Mrs. Bartels. Both of these witnesses were well acquainted with Mrs. Bartels, and their testimony shows that she was, at the time of the execution of this will, apparently of perfectly sound mind. Jones testified: "I had known Mrs. Bartels at that time 10 or 11 years. From what I saw of her at that time, she was very sound of mind, she had a great deal of common sense, and was as rational and as sound as I had ever seen her, and I had seen her a great many times." Miss Fraser, who was stenographer for appellant, Ira P. Jones, and took down in shorthand and copied the will as dictated to her by Mr. Jones, testified that before Mr. Jones came into the office Mrs. Bartels stated the purpose of her visit, and discussed the will with her. "With reference to her apparent mental condition she seemed to be perfectly intelligent about everything she said, she seemed to be of sound mind." The witness further says: "I don't know any particular portion that she discussed with me. She said that she had come up to make her will, and wanted to divide her property equally among her children; she had before made gifts to some of her children who had married, and she wanted to divide her property among the other children equally; she had made gifts to some of the children before. I don't know that she mentioned which ones she had made gifts to. She wanted to put the portion that she was giving to Charles Bartels in the hands of Fred as trustee; I recollect that distinctly. She said that she didn't want any trouble after she died; she wanted the children to be perfectly satisfied. She didn't talk like she expected to die soon. She said that her health was bad. She said she hadn't been feeling well. For a 'person of her age, I don't know that she was any more feeble than any one else would be at her age. I say she had been up there quite frequently. She hadn't always been complaining of being sick. I never heard of her complaining of being sick before. When Mr. Jones came in, she told him that she wanted him to fix up this will. It was

about three-quarters of an hour after he came in before I commenced writing it—I imagine it was about that length of time. She and Jones during that three-quarters of an hour were in the private office. After that I took down the dictation—went into his office and took the dictation. She was in his office during that time. * * * The will carried out her wishes as she expressed them to me and to Mr. Jones."

The will of the 14th of October, 1911, was witnessed by Wm. H. Olschewske, Meyer C. Wagner, and E. A. Sonet. These witnesses all testified that Mrs. Bartels was apparently of perfectly sound mind at that time, that the will was read and explained to her by Mr. Jones, that she understood and expressed herself as fully satisfied with it, and requested them to sign it as witnesses.

Olschewske testified: "At that time I had known Mrs. Bartels 20 years or more. I saw her before that time quite frequently—not before the 20 years, but before the will was executed. Judging by what I had known of her for the last 20 years, she certainly was of sound mind. When I went there I went with Mr. Jones and Mr. Wagner at the request of Mr. Jones. When I went into the room, Mrs. Bartels recognized me; she shook hands with me and talked with me, and we talked of things that happened previous to this—made a social visit in talking with her."

Wagner testified: "At the time she executed this will, from my observation of her manner and how she appeared to be, I am prepared to state whether she was in one condition of mind or another. Her mental condition appeared to be good, sound."

The evidence shows that Mrs. Bartels died of Bright's disease, and that she had suffered from that disease for several years before her death. She gave up her stand at the city market in 1902, and did not engage in business after that time. She had been troubled with swelling of her lower limbs before she quit business, and, as one of the appellees' witnesses expressed it, "she was crippled up with dropsy a great deal for 10 years before her death." Both of the appellees testified that her physical condition affected her mind, and that, as the disease progressed, her mental condition became worse, and both of these witnesses expressed the opinion that she was not of sound mind for three or four years before her death.

The substance of Mrs. Milam's testimony is as follows: "I saw my mother, say, ever since I have been born; every week or every few days since I was married; when I lived close, every day. During the latter portion of her life, I lived right across the street. I lived right across the street ever since she came back to Fred's; that was along in 1911, in June. * * * I say my mother came back there in 1911, after she left Mrs. Minster's. During that time I prepared the meals for my mother, part of the time; but

every day—every morning—I taken her breakfast or sent it to her, and she would wait for it. Sometimes I would be a little late, but she would wait for it. I remember when she left the market. I know why she left the market. Her health was bad. She couldn't hold up any longer at the market. She had swollen limbs—her limbs were greatly swollen—and she complained of her back. That did not always confine her to her bed, but sometimes. After she left the market, she lived at her own home then. That was not right across the street from me; that was where Mrs. Sonet lived. Mrs. Sonet was living about two blocks from me, I should say; that is where my mother lived. Sonet and his wife lived with her; it was her home. I saw her pretty near every day. After she went there—quit the market and went there to live—I noticed a change in her physical and mental condition; she didn't seem the same. Sometimes you would go in and I would speak to her, and she wouldn't hardly speak; she would kind of look up like she was surprised, and say: 'Oh! it is Annie.' I began to notice that, I would say, four or five years ago, shortly after she left the market. Her physical condition got worse, and her mental condition got worse. Sometimes I would talk to her, and she would talk maybe for a few minutes all right, and then she would get onto another conversation, and, before she would get that finished, it would be something else. With respect to being able to keep her eyes open towards the last, she could not; she was in a stupid condition. She taken morphine or some kind of medicine; I gave it to her myself. It was some kind of medicine—I don't know whether it was morphine or not. As to whether I heard the doctor say something about some medicine that she was taking that had morphine and chloroform in it, I never paid any attention; the effect of the medicine would make her sleepy, drowsy. As she went along from month to month and year after year, with respect to her mental condition, it got worse. About that time, say three years before her death, I did have a talk with her, or she with me, about being poisoned. She would sometimes say that my sister had told her that I had poisoned her, and then again she would say she was afraid to stay there because she was afraid she would be poisoned, and I knew that wasn't so, because I knew my sister wouldn't do that. As to how many times she stated that to me, she would get in conversation; she would always mention something in effect of that kind. In conversation in that respect, and in other things, she was not, in my opinion, sane—of sound mind. I don't think she was, or she wouldn't have said such a thing; she seemed to me like her mind was not what it ought to have been. I say that condition extended over three years before her death. That condition and that habit of hers of making these statements about being poisoned, that my sister was going to poison her, or that she had poisoned her, or that I had poisoned her, that increased. She was not the same woman mentally at this time that she was formerly. My mother, in my opinion, was not of sound mind during this period."

On cross-examination, she said: "When I rang up Mr. Jones to come over and draw up the will, I did not say to Mr. Jones that my mother was of unsound mind, and not mentally able to make a will. I done just what she asked me to do. As to my believing at that time that I was going to get a larger share of her estate than I did get, I thought I would come in equal shares with the rest of them. Mother had always been so kind to me that I couldn't realize why I shouldn't. Of course, it was an awful blow to me. * * * I did send for Mr. Jones to come out and draw a will for my mother, having the conviction in my mind that she was insane, that is true. I wanted to do just what she wanted done."

Several other witnesses for appellees, who were well acquainted with Mrs. Bartels, testified that her mind was very much affected by her disease, and that she was not like she was before she became afflicted with dropsy; that she was absent-minded; and at times, when she was engaged in conversation, she would suddenly go to sleep or lose consciousness for a few minutes.

The appellee J. W. Milam, after testifying that, in his opinion, she was not of sound mind for three or four years before her death, and stating that this opinion was based on the fact that she could not carry on a conversation for any length of time, that after talking for a few minutes she would suddenly become silent, and, when the conversation was resumed, she would not remember what had been previously said, further testified: "I say that the condition existed as many as four years before her death at times, not all the time—she was not in that condition all the time."

Mrs. Minster, a sister-in-law of Mrs. Bartels, who was a witness for appellees, after telling of Mrs. Bartels' sickness and her inability during the last months of her life to carry on an extended conversation, testified: "She never went crazy; she never lost her mind and became insane; she was only weak—she was weak physically. I could not say she had a weak mind, but you can get so weak that, when anybody talks to you, you will drop off to sleep, and that was the result of her physical weakness." She further testified that, during the first half of the year 1911, Mrs. Bartels lived at her house for four months, and she told witness a half dozen times while she was at her house that she wanted to divide her property equally among the children. About a week after the last will was executed, she told this witness that she had made her will, and made it just like she wanted to, like she had previously told witness. At the time this conversation

occurred, the witness thought the deceased was of sound mind—"she appeared to be of sound mind."

Dr. Ross, an expert in mental and nervous diseases, testified, in substance, that Bright's disease often affects the mind of the patient and causes mental delusions; that the disease is a progressive one, and swelling of the feet is one of its symptoms; that, when the limbs begin to swell, it indicates that the poison is being disseminated through the body. This produces edema of the brain cells. The whole body is affected, and sometimes the effect upon the mind is more marked than upon the body. He had never seen the deceased.

Dr. Grimes, a witness for appellees, testified that he made seven professional visits to deceased from September 22 to October 25, 1911, and that, when he first went out there, he found her confined to her bed, and that she had considerable edema, and that she could neither sleep nor get any rest; and he stated that she was about in the last stages of Bright's disease, and that she was affected with dementia. He further stated that, from his observation of Mrs. Bartels during this month he treated her, and from his knowledge of the disease and the course it takes, he was sure she had been so afflicted for perhaps several years; and he further said: "The condition in which I found her indicated the progress of that disease over a series of several years."

Mrs. Schnauffer, a witness for appellees, testified that at one time Mrs. Bartels' son Freddie ran away from home, and that she had seen her kneel under a tree in the back yard that Freddie had planted and pray for his return, and that she used to sit and study a great deal, and grieve, and that she considered this an indication of unsound mind.

Mrs. Chapman, Mrs. Milam's daughter, testified that Mrs. Bartels' memory was very weak about events and things that had taken place, and that she was not, in her opinion, a woman of sound mind during the last three years of her life, and that her reason for this opinion was that she would sit and study, and would nod, and sometimes she would be very friendly, and again she would not. On cross-examination, she said: "The only symptoms that I saw of any difference in my grandmother's mind between that and what it had been previously was that she would sit and study, and sometimes, in the midst of my talking to her she would drop off to sleep. There was nothing else."

Two half-sisters of Mrs. Bartels, who saw her often during the last year of her life, one of them as often as two or three times a week, testified that she was of sound mind, understood her business, and had no "crazy notions" or delusions that witnesses knew of.

Charles Bartels, who was at one time the husband of deceased, her two sons, Charles and Fred, her daughter Mrs. Sonet, son-in-law, Ed Sonet, and Mrs. Lynch, an intimate friend, all testified that Mrs. Bartels had a good mind up to the day of her death. Mr. and Mrs. Sonet were present when the will of October 14, 1911, was executed, and both say that she was of sound mind at that time, and fully understood the provisions of the will.

Rev. Mr. Wyndham, who visited her during her last sickness, and saw her a few days before her death, testified: "I never saw anything that would indicate she was not in her right mind when I was with her. She had the appearance of being of sound mind; not that I remember did I ever see her at any time when she appeared to be of unsound mind. I saw her as far back as October, before she died. I think her mental condition then was apparently sound. I officiated at her funeral, buried her. She was buried according to the rites of the Episcopal Church. * * * As to whether it is a fact that any time that I visited her several months before her death she was able to do much talking, not when I would be there; I wouldn't attempt to talk to her. When I did attempt to talk to her, I noticed on some of the occasions that I was there that she would close her eyes and apparently fall off into an unconscious condition; she did that. Towards her last illness she was in that weakened condition, and didn't seem to want to talk, and I did not; I just called in. That occurred three or four months before her death; it occurred all the time while I went to see her."

Mrs. Sabbayrac, a former tenant of Mrs. Bartels, testified she saw Mrs. Bartels the Christmas before she died, and, as far as witness knew, her mind was all right. The witness says: "She was all right when I saw her just before Christmas—I mean her mind. Not that I knew of did I ever see anything about her to indicate that there was anything wrong with her mind."

Mrs. Leitch, an osteopathic physician, testified as follows: "I was acquainted with Mrs. Julia Bartels in her lifetime. The occasion of my becoming acquainted with her was that I was called to treat her. The first treatment I gave was November 2, 1911. Then after that I treated her every other day, and a few times every day—for a while every day—until the day before her death. Always talked with her during my treatments. From my observation of Mrs. Bartels during the time I was treating her, her mind was always in good condition when I was there; never wavered from any subject we were speaking of; in fact, I can't say, not at any time did I find that her mind was weakened at all. Her physical trouble was dropsy, caused by a cancerous tumor. That had not in any manner affected her mind."

Dr. Larendon, who had known Mrs. Bartels for 30 years, and had been her family physician for a number of years, testified: "At the time I first visited her, between the

20th of October and the end of the month, her mental condition was always perfectly normal. She died in January, I think; and I think most every day I was there in the latter part of December and January. If there had been anything about her manner or her appearance or her conversation which would indicate that her mind was in any respect unsound, I would have observed. There was absolutely nothing, in my mind, as to the condition of her mind being wrong in any way; her mind was always good. I am positive her mind was good."

Mrs. Milam testified, in rebuttal: "I heard Dr. Larendon state that her mind was perfectly clear. I was very much surprised at Dr. Larendon, because I could not get him up close enough to her to feel her pulse. He said she was mad, and he was afraid of her. The statement of the witnesses here that all that day she had her right mind—the day of her death—is not true. She did not recognize me or anybody else that day. Dr. Larendon said she had hydrophobia."

The estate left by Mrs. Bartels was worth $50,000 or $60,000. There is no evidence that she had ever given Mrs. Milam any money, and the latter testified that her mother had never given her money, either before or after her marriage. The undisputed evidence does show, however, that deceased had given Mrs. Milam more property than she had given any of her other children. The evidence further shows that a misunderstanding or disagreement existed at one time between Mrs. Milam and her mother, but the evidence justifies the conclusion that the hard feelings between them had ceased to exist some time prior to the making of the wills.

Mrs. Minster, from whose testimony we have before quoted testified: "I really don't know how many years ago it is that Mrs. Helmke—now Mrs. Milam—got a divorce from her first husband; it is more than 6 or 7, or 8 or 9 years—fully 12 or 13 years ago, I guess. As to whether there came up hard feelings between Mrs. Helmke and her mother after that divorce suit, I think that must have been the trouble, hard feelings did arise between them about that time, but it didn't amount to much; she overlooked it all. I think that Mrs. Bartels had concluded to forgive her for whatever wrong she may have done her, but there was hard feelings at that time between them over the divorce."

Mr. Milam testified that there was no estrangement or difficulty between his wife and her mother, "only a little mythy feeling that only lasted a week or so."

Mrs. Milam testified, in regard to this matter: "The relations between me and my mother from the time of my second marriage, my marriage to Jim Milam, down to the time of her death was friendly. There was never any estrangement between me and my mother to amount to anything. There wasn't any estrangement; any family has a little

falling out once in a while, but it don't amount to anything; we were friendly all the time. The little difficulty I speak of was just because the children went to her, and I wanted them to stay at home. I wanted my children myself, and they had gone to their grandmother, and any other mother would that loved her children. Certainly I had a mother's feeling for my children, and wanted them back. After they were sent to my mother's, I visited them there; I visited them at least once a week, and sometimes more; they stayed there a little over a year; they came back to me within a year's time."

The undisputed evidence shows that, during the last year of Mrs. Bartels' life, Mrs. Milam was exceedingly kind and attentive to her. Mr. and Mrs. Milam both testified in regard to the statements made by Mrs. Bartels that Mrs. Sonet had told her that Mrs. Milam would poison her; that neither of them believed that Mrs. Sonet had made any such statements to Mrs. Bartels; and that Mrs. Bartels told them, when she repeated to them the alleged statements of Mrs. Sonet, that she did not believe what Mrs. Sonet had told her. Mrs. Sonet denied that she had ever made any such statements to her mother or to any one.

At the time the will of October 14, 1911, was executed, as we have before stated, Mrs. Sonet and her husband were present. They came to visit Mrs. Bartels, as they testify, not knowing that a will was to be executed, or that any visitors were there. When they came into the room and found Mr. Jones reading the will to Mrs. Bartels, they hesitated, but, upon being told that there was no secret, and that their presence was not objectionable, remained. They then learned the contents of the will. While the will was being read, and when it was being signed, Mrs. Sonet sat in a few feet of her mother and was looking at her. She testified that she was looking her mother in the face when she executed the will. The evidence shows that there was bad feeling between Mrs. Sonet and Mrs. Milam, and that, after Mrs. Bartels' death, Mrs. Sonet on several occasions remarked that she would not give Mrs. Milam 25 cents for what she got under her mother's will. One of these statements was made in Mrs. Milam's presence at the cemetery on the day of Mrs. Bartels' burial, and the statement was repeated several times before the will was produced and its contents disclosed.

We believe the foregoing statement contains the substance of all the testimony adduced upon the trial.

Without discussing the several assignments of error in detail, we are of opinion that the verdict of the jury that the deceased did not have testamentary capacity at the time either of the wills offered for probate was executed is so against the overwhelming weight of the evidence that it clearly indicates that the jury must have been improperly influenc-

164 S.W.—55

ed in reaching such conclusion. This does not mean that the jury were conscious of any wrongdoing in finding that Mrs. Bartels did not have sufficient mental capacity to make her will. It is not improbable that, because of the apparent unfairness in the will in the proportion of the estate bequeathed to Mrs. Milam, the jury concluded that they were authorized to do what they conceived to be justice between the parties. However praiseworthy such motive may have been, the law does not authorize a jury to hold a will invalid merely because it does not appear to be a fair and just distribution of the estate of the testator.

[2] The right of the owner of property to dispose of it by will as he may please is one that is often of great value, especially to those who are old or infirm and dependent upon others for services and attention; and this right should be as jealously guarded as any other property right. Salinas v. Garcia, 135 S. W. 591.

[3, 4] When a will has been executed with the formalities required by the law, it ought not to be set aside merely because the disposition made by the testator of his property is not in accordance with what appears to be justice and fairness to those entitled to his bounty. If in any case, however, it is shown that, at the time of making the will, the testator did not have sufficient mental capacity to understand what he was doing and know the nature and extent of his property and the objects of his bounty, and the disposition made of his property, the will should not be allowed to stand.

If the testimony of Mr. Jones and the subscribing witnesses to these wills is true, there can be no doubt of the fact that Mrs. Bartels fully understood what she was doing when she executed these wills. They were written as she directed, and, when read over to her, she fully understood their contents, and stated that they expressed her wishes. With the exception of Mr. Jones, these witnesses had no interest in the matter, and none of appellant's witnesses were impeached or attempted to be impeached as unworthy of belief. The testimony of appellees and their witnesses as to the mental capacity of Mrs. Bartels does not necessarily conflict with the testimony of the witnesses to the will and of Mr. Jones. The facts upon which the opinion of the appellees' witnesses as to the mental capacity of Mrs. Bartels is based do not justify the conclusion that she did not have testamentary capacity at the time either of the wills was executed. It is not shown that the condition of mental weakness, or, to speak more accurately, weariness caused by her bodily affliction, was a continuing condition; but, on the contrary, Mr. Milam expressly states that she was only in that condition at times, and that it did not exist all the time. We think the evidence in the case hardly raises an issue as to the testamentary capacity of Mrs. Bartels on the dates the

wills were executed, and the finding of the jury that she did not have sufficient capacity to make the wills is so against the overwhelming weight and preponderance of the evidence that it should not be allowed to stand.

[5-7] We do not think the evidence raises the issue of undue influence in the execution of the will of October 14, 1911; nor is there any evidence to sustain the finding that either of the wills in question was the result of an insane delusion on the part of Mrs. Bartels which affected the disposition of her property. Undue influence cannot be predicated alone upon the fact that the will is unfair or unjust in some of its provisions, and for that reason unnatural. There must, in addition to this, be some evidence direct or circumstantial tending to show that some person in whom the deceased imposed confidence and trust, and who was in a position to exercise influence over the mind of the testator, exercised that influence in dictating the disposition of the property made by the will. There is no evidence that any influence was exerted over Mrs. Bartels by any one, nor evidence of any circumstance tending even to show that any one had sufficient influence over her to control or dictate the disposition made by her of her property. Mayes v. Mayes, 159 S. W. 919; Brown v. Mitchell, 75 Tex. 14, 12 S. W. 606; Delgado v. Gonzales, 28 S. W. 459; Wetz v. Schneider, 34 Tex. Civ. App. 201, 78 S. W. 394; Berry v. Brown, 148 S. W. 1117.

[8] The only evidence of any insane delusion on the part of Mrs. Bartels is the testimony as to her statement that Mrs. Sonet had told her that Mrs. Milam would poison her. Mrs. Sonet did not make this statement, and, if Mrs. Bartels believed that she had made such statement, she was under a delusion. But, conceding this to be true, the undisputed evidence is that Mrs. Bartels, whenever she mentioned the matter, stated that she did not believe that Mrs. Milam would poison her, and the fact, which is also shown by the undisputed evidence, that she allowed Mrs. Milam to prepare her meals for her, and always waited for her to prepare and bring her meals to her, conclusively shows that she did not believe the statement in regard to Mrs. Milam. This being so, her delusion as to Mrs. Sonet having made the statement could not possibly have influenced her bequest to Mrs. Milam.

[9] The statement in each of the wills, following the bequest to Mrs. Milam, that "I have previously given her money and property more than I have any other child" is shown to be inaccurate, in so far as the money is concerned, but we do not think that proof of the fact that a testator has made an inaccurate statement in his will in giving his reason for making a bequest is sufficient to show that he was suffering from an "insane delusion," or to raise such an issue. The inaccuracy might be due to mistake, or

might be intentionally misleading, and we do not think it can be regarded as any evidence of insanity or of an "insane delusion."

The assignments complaining of the verdict upon the grounds indicated must be sustained.

[10] We think the charge of the court instructing the jury that it was incumbent upon the proponent of the will to prove to the satisfaction of the jury that the testator was possessed of testamentary capacity at the time the will was executed should not have been given. The requirement that, before a will can be admitted to probate, the court must be satisfied that the testator was of sound mind only affects the sufficiency of the testimony offered by the proponent when considered by itself, and does not change or modify the rule that a jury, in passing upon conflicting testimony, must decide according to the preponderance of the evidence. As given, the charge was misleading. Cantine v. Dennis, 37 S. W. 187; Palm v. Chernowsky, 28 Tex. Civ. App. 405, 67 S. W. 166. The question, however, is not properly presented in appellant's brief, and, for that reason, we would not reverse the case on this ground.

For the reasons indicated, the judgment of the court below is reversed, and the cause remanded.

Reversed and remanded.