**WILSON et al. v. PAULUS et al.**
(No. 1129—5068.)

Commission of Appeals of Texas, Section A.
March 27, 1929.

J. Lee Dittert, of Bellville, Fred L. Blundell, of Lockhart, and Allen B. Hannay, of Houston, for plaintiffs in error.

C. G. Krueger, of Bellville, and Fly & Ragsdale, of Victoria, for defendants in error.

CRITZ, J. This is a will contest instituted by E. B. Wilson and his two sisters and brother, who are plaintiffs in error in this court, to prevent the probating of the alleged will of E. B. Wilson, Sr., deceased; said E. B. Wilson, Sr., being the grandfather of said contestants, whose father, Jesse Wilson, son of E. B. Wilson, Sr., was dead at the time of the death of E. B. Wilson, Sr., and at the time of the making of the will in question. The said E. B. Wilson, Sr., left, as his heirs at law, his four grandchildren, E. B. Wilson, Jr., J. W. Wilson, Sarah Elizabeth Wilson Helmuth, and Ollie Wilson, plaintiffs in error in this court, and his two daughters, Mrs. Annie C. Paulus and Mrs. Effie Kearns, who, with Henry S. Paulus, are defendants in error in this court. Mrs. Minnie Wilson, who is one of the beneficiaries under the will, is the widow of Jesse Wilson, deceased.

The salient features of the will are set out in the opinion of the Court of Civil Appeals, and will not be repeated here.

Trial was had before a jury in the district court of Austin county, on appeal from the county court of said county. At the conclusion of the testimony in the district court, the trial judge instructed the jury to render a verdict in favor of probating the will, and in favor of the proponents of the will, which verdict was returned by the jury, as instructed by the court, and judgment was entered admitting the will to probate. The case was duly appealed to the Court of Civil Appeals for the First District, which court affirmed the judgment of the district court. 300 S. W. 661. The case is now before this court on writ of error granted on application of the contestants. The grounds of contest are alleged lack of evidence legally sufficient to support the allegation of due exe-

cution of the will, lack of testamentary capacity, and undue influence.

■ By their first assignment of error, the contestants contend that the Court of Civil Appeals erred in holding that there is evidence in the record legally sufficient to show due execution of the will.

The will is signed by E. B. Wilson, and witnessed by O. E. Steck and E. B. Wilson, Jr., and over the signatures of these two subscribing witnesses is the following written statement or attestation clause, which clause appears just under the signature of E. B. Wilson:

"*Signed, declared, and published by E. B. Wilson as his last will and testament in the presence of us, the attesting witnesses, who have hereunto subscribed our names in the presence of E. B. Wilson at his special instance and request this the 12th day of May, A. D. 1925.* [Italics ours.]

"O. E. Steck
"E. B. Wilson, Jr."

Dr. O. E. Steck, one of the subscribing witnesses to the will, was called as a witness by the proponents, and testified in regard to the execution of the will, in substance, as follows: That the witness was a practicing physician, and had been such for 26 years; that he knew E. B. Wilson, Sr., during his lifetime; that said Wilson died in Bellville, in Austin county, Tex., about the 10th or 11th day of November, 1925; that testator was about 81 or 83 years of age at the time of his death; and that witness knew the deceased intimately and was his family physician, and treated him during his last illness.

This witness then testified as follows:

"I do not know just how to answer your question as to whether I know of his making a will. I have seen this instrument that you show me before. That is, I saw this part of it. By this part, I mean the last part; I don't think I ever saw any of the other part of it. This, which I will read, is the part that I saw: 'Wherefore, I hereto set my hand, this the 12th day of May, in the year of our Lord 1923.' Signed: 'E. B. Wilson, Sr.' The part of it that I saw was: 'In testimony whereof I have hereunto set my hand this the twelfth day of May, A. D. 1923.' Signed. 'E. B. Wilson, Sr.' 'Signed, declared and published by E. B. Wilson as his last will and testament, in the presence of us, the attesting witnesses, who have hereto subscribed our names in the presence of said E. B. Wilson, at his special instance and request this the 12th day of May, A. D. 1923.' Signed: 'O. E. Steck, E. B. Wilson, Jr.'

"That is the part I had reference to. Because I recognize my signature, from which I know I signed this, and from this statement, saying that I saw E. B. Wilson sign this, and signed it in his presence, I say that I saw it signed. My impression is that this was signed in the back end of the First National Bank, in Bellville, Texas. I cannot say positively whether E. B. Wilson, Jr., was there. Basing my testimony on this paragraph which I just read, E. B. Wilson, Jr., was present. When this instrument was signed, I was 47 years old. I think E. B. Wilson, Jr., must have been about thirty years old; he was over fourteen years old."

On cross-examination this witness testified in regard to matters connected with the signing of the will as follows:

"From this instrument that I signed, I know that I signed it; I have a faint recollection of the fact. I do not remember positively where I was just prior to the signing of the will. As to my best recollection of how I happened to go to that place on that occasion—my office is directly upstairs in the building in which it was signed, and it seems to me that someone met me in front of the bank building and along about the front door, and asked me to go back in there. Mr. Henry S. Paulus did not at that time meet me there and tell me that I was one of his grandfather's best friends, and that he wanted me to sign his will; I do not remember that. I do not remember whether I have previously stated that it was my best impression that Mr. Paulus was present when the will was signed, or not. It would be more or less guesswork for me to say now whether it is my best impression that Mr. Henry S. Paulus was present at the time the will was signed. I can't say whether he was in the directors' room, or the room in which this instrument was signed, or not, but I believe he was about the building there, in the front or somewhere. I believe that; I am not saying positively that he was. As to whether I will state that he did not ask me to sign it, all I can say is that someone asked me to come in there. I can't say that it is my best impression, thinking back a great many years, that it was Henry Paulus. I have no recollection of any one else any more vivid than I have of him on that occasion. I said that I believed that Mr. Henry Paulus was somewhere about when the will was signed; I think that. You don't want me to use the word 'impression,' but that is the only way I can state it. It is my impression that Henry Paulus was somewhere there in the building when the will was signed. I cannot answer in any other way, as to whether he was 'present' when it was signed. I presume that my memory is as good now as it was when I testified downstairs about the matter. Downstairs, before Wammel, in answer to the question: 'Isn't it your impression that Henry Paulus was present when the will was signed,' I testified: 'Just giving my best impression; that would be a guess.' I think in substance that is about what I answered here a few minutes ago. That is my testimony now. Henry Paulus was present there somewhere when the will was signed; whether he was present right where the will

was signed or not, I do not know. I think he was present there somewhere when the will was signed."

There is no evidence in the record of any character to contradict the evidence of Dr. Steck.

Under this state of the record, the proponents of the will, defendants in error here, contend that the attestation clause contains all the requisites necessary to prove the due execution of the will, and that, where such is the case, the declarations of the attesting witness as contained in the attestation clause, constitute presumptive evidence of the proper execution of the will, and that such presumption does not have to be supported by the affirmative memory of the attesting witnesses, but, in order to defeat the will, must be overcome by evidence to the contrary, citing, among other authorities, 40 Cyc. p. 1304, and 28 R. C. L. pars. 370 and 373.

The rule as laid down in 40 Cyc. 1304, is as follows: "A full attestation clause reciting compliance with all formalities of execution and signed by the witness is prima facie evidence of the validity of the will, although the witness' memory is faulty, or he contradicts the facts stated in the clause, or where he is dead. The statements of the attestation clause may, however, be rebutted by proper evidence."

The rule as laid down in 28 R. C. L. 370–373, is couched in more extended language, but is to the same legal effect as the rule laid down in 40 Cyc., supra.

The Commission is in accord with the contention of proponents, but, after a conference between the Commission and the Supreme Court, the court itself holds that, even to give full application to the rule as announced by the above authorities, that there is no evidence in this record to show that the testator executed the will with the formalities and solemnities and under the circumstances required by law to make it a valid will, as required by subdivision 4 of article 3348, R. C. S. of Texas 1925, in that the testimony wholly fails to show the genuineness of the signature of more than one subscribing witness to the instrument offered for probate. The Supreme Court construes articles 3344, 3348, and 8283 as permitting a will not wholly written by the testator, which is produced in court, to be proven by one subscribing witness, but, before such a will can be admitted on the testimony of only one subscribing witness, such testimony must establish the attestation of the will, not by such subscribing witness alone, but by at least two credible witnesses above the age of 14 years.

■ It is contended further that the proponents of the will have failed to meet the requirements of subdivision 5 of article 3348, R. C. S. of Texas 1925, which imposes the burden on the proponents to prove that the will offered for probate has not been revoked by the testator. The direct evidence in the record

in regard to this matter is the testimony of Dr. Steck, one of the subscribing witnesses, who testified: "Of my own knowledge, I do not know whether or not Mr. Wilson ever revoked this will."

The Court of Civil Appeals, in passing on this question, holds: "We also think the testimony of Dr. Steck that he did not know of his own knowledge 'whether or not Mr. Wilson ever revoked this will' is equivalent to a statement that he had no knowledge of a revocation of the will and is ordinarily the only way by which the negative fact of the nonrevocation of a will can be shown. When there is added to this testimony the circumstances that there is no evidence even suggesting the execution of a subsequent will, or the revocation of the will offered for probate, no other reasonable inference can be drawn from the evidence than that the will offered for probate had not been revoked."

We agree with the holding of the Court of Civil Appeals above quoted. In a large majority of cases, the only proof that can possibly be offered to prove that the will has not been revoked is negative proof, and, in the absence of any proof whatever that the will has been revoked, we think the evidence of Dr. Steck was, as a matter of law, prima facie proof that the will had not been revoked. Further, such testimony was certainly some evidence to that effect, and its sufficiency was for the Court of Civil Appeals.

■ On the issue of testamentary capacity, there is absolutely no evidence in the record raising this issue. It is true that the evidence shows that the testator was old and feeble and could not see without the use of a magnifying glass at the time the will was signed, but we are unable to find any evidence that would raise the issue of want of testamentary capacity, or of unsoundness of mind. The testator seems to have accumulated a considerable estate, and he managed his own business affairs up to the time of his death. Dr. Steck, who was his family physician, and attended him during his last illness, testified that he was not of unsound mind, but was of sound mind. Judge C. D. Duncan, county judge of Austin county, and a practicing attorney of that county, testified that he had known testator well for 15 years, and had talked with him frequently, and had observed his actions and conduct in daily walks of life, and that the witness regarded the testator as a man of sound mind, and a man of determination and pronounced convictions. No witness testified that he was of unsound mind, or to any facts that would either directly or circumstantially raise that issue. Under such a record, the trial court certainly was correct in not submitting the issue of want of testamentary capacity to the jury.

■ We also agree with the holding of the Court of Civil Appeals that the evidence does not raise the issue of undue influence. In fact, according to our opinion, there is ab-

solutely no evidence that would justify the submission of such an issue.

In regard to the allegations of undue influence of Mrs. Annie Paulus and her husband, the evidence shows conclusively that neither were present when the will was executed. As found by the Court of Civil Appeals they both lived 50 or 60 miles from where the testator lived, and in another county. There is no evidence in the record, directly or circumstantially showing or tending to show that either of them had anything to do with the writing or signing of the will, or that either of them ever, at any time, exercised or attempted to exercise any influence on testator in regard to the disposition of his property, or that either of them even knew about the execution of the will prior to or at the time of its execution. There is no evidence of any character to show that they in any way consulted, advised with, or conspired with testator or Henry S. Paulus in regard to the making of the will or in any way in regard to the disposition of testator's estate.

In regard to the allegations of undue influence of Henry S. Paulus, we think there is no evidence in the record, direct or circumstantial, of any probative force, that would have justified the trial court in submitting the case to the jury on the allegations of undue influence by said Henry S. Paulus. The evidence in regard to this matter is to the effect that testator was old and feeble, and could not see well enough to read without the use of a strong magnifying glass at the time he signed the will. It is also shown that he left Mrs. Paulus more property than he did the other daughter, Mrs. Kearns, and that he left two of his grandchildren $2,500 each and two of them nothing of material value. But, on the other hand, he left a house and lot to the mother of the grandchildren, she being the widow of Jesse Wilson, deceased son of testator. It is stated in the will that no bequests are left to E. B. Wilson, Jr., and Elizabeth Helmuth, grandson and granddaughter respectively, because testator had already given them their share of his estate. There is no evidence in the record contradicting this statement of the will. It was also shown that testator had given Jesse Wilson, his deceased son, and father of contestants, a farm prior to his death. It is shown that testator had two or three times prior to his death stated that he was not going to make "hair or hide" difference among his children, and that testator was on friendly and intimate terms with contestants. As shown by the record, Henry S. Paulus, who is a lawyer, wrote the will, and is made executor and beneficiary thereunder. He will get the usual fees for acting as executor, but he must earn these fees under the law. It is shown that Henry S. Paulus, who is the son of Annie Paulus, and

grandson of testator, had represented the testator on two occasions prior to the making of the will, and was present somewhere in the building at the time the will was signed.

■ The will on its face may not bequeath the property according to the laws of descent and distribution, but, taking into consideration the fact that he had made gifts to his children and grandchildren prior to his death, we are not prepared to say from the record that he has made an unnatural, or unequal distribution of his estate. However, if it be conceded that testator has not made a distribution of his estate according to the law of descent and distribution, that fact alone would not justify setting aside his will. There is no evidence in the record, direct or circumstantial, that Henry S. Paulus influenced or caused the execution of the will other than that he wrote it, and was present somewhere in the building when it was signed, and was made executor and a beneficiary to some extent thereunder. On the other hand, the name of E. B. Wilson, Jr., one of the grandchildren, and one of those whom the will states had already received his share of the estate appears on the will as a witness. Under such a state of the record, even if it be conceded that the will does not make an equal distribution of the estate according to the laws of descent and distribution, such fact in connection with the other recited facts, would not, as a matter of law, justify submitting the issue of undue influence by Henry S. Paulus to the jury.

We have given careful consideration to the assignments in regard to the admission and rejection of testimony, and in this connection we have carefully examined the bills of exception in regard to these matters, and in our opinion none of these assignments present reversible error. Had all the evidence admitted, which was objected to by contestants, been excluded, and had all the evidence offered by contestants, and excluded by the court, been admitted, the result of the trial would have been the same.

From what we have said, it follows that, on account of the holding of the Supreme Court itself that the will is not properly proven, we recommend that the judgment of the district court and the Court of Civil Appeals be both reversed and the cause remanded to the district court for a new trial.

CURETON, C. J. Judgments of the district court and Court of Civil Appeals are both reversed, and cause remanded to the district court as recommended by the Commission of Appeals.

We approve the holding of the Commission of Appeals on the questions discussed in its opinion.