## CAMERON et al. v. HOUSTON LAND & TRUST CO. et al.

No. 11560.

Court of Civil Appeals of Texas. Galveston.

Oct. 7, 1943.

Rehearing Denied Nov. 23, 1943.

Bert H. Tunks, Mrs. Huis Coy, J. S. Bracewell, and Jesse A. Pardue, all of Houston, for appellants.

Charles Murphy, W. H. Davidson, Jr., and Chas. W. Bell, all of Houston (Fulbright, Crooker, Freeman & Bates, of Houston, of counsel), for appellees.

GRAVES, Justice.

This general statement, conceded by the appellees to be substantially correct as such, has been taken from the appellants' brief, after correction of the recitation in

lines 5 and 6 thereof, "that there was no sufficient evidence as to any of the grounds of attack upon the will" so as to read, "there was not sufficient evidence to raise an issue of fact as to any of the grounds of attack upon the will", to-wit:

"This is a will contest. The testator was named William Hugh McCarn. The contestants (appellants here) are Mrs. Billie Clair Cameron, the daughter and only child of testator, and her husband, H. N. Cameron. The proponents (appellees here) are the Houston Land & Trust Company, Trustee, John Alvin McCarn, Daniel Oscar McCarn, brothers of testator, the legal representatives and heirs at law of Jeff McCarn, another brother of testator who died about a month after testator did, and Miss Maud Keen, a former employee and friend of testator. The will involved was admitted to probate in the County Court of Harris County, and the matter was brought into the District Court through the medium of a writ of certiorari. After presentation of evidence in the District Court, and overruling proponents' motion for instructed verdict, one special issue, inquiring as to testamentary capacity, was submitted to the jury, which, after deliberation, was unable to reach a verdict. After the jury had been dismissed, the trial court, on motion by the proponents, entered a judgment admitting the will to probate, concluding as a matter of law 'that there was not sufficient evidence to raise an issue of fact as to any of the grounds of attack upon the will' asserted by the contestants. The contestants' motion for new trial was duly filed and presented, and was overruled. The contestants duly excepted and have perfected their appeal to this Honorable Court."

The will involved was conclusively shown to have been the second and last will executed by the testator, William Hugh McCarn, and bore date of April 20 of 1936, when he was 66 years old, which was six years before his death on April 3 of 1942, he then being 72. His estate was shown by the inventory filed in the county court to be of a value in excess of $111,000. As indicated, the appellant, Mrs. Cameron, was the testator's only child, he having left no surviving wife, and his other relatives at the time of his death being the appellees, Alvin and Oscar McCarn, who had no children, along with the three children of a third brother, Jeff Mc-Carn, who had died soon after the testator had.

The appellants challenged the validity of the will in suit upon two grounds in the trial court: (1) That the testator did not have testamentary capacity at the time of executing it; (2) that it had been procured by undue influence exerted upon him by John Alvin McCarn, Daniel Oscar McCarn, and Jeff McCarn.

On appeal they, in their first three points of error, challenge the trial court's holding that there was not sufficient evidence to raise an issue of fact as to either the claimed want of testamentary capacity, or the exertion of such undue influence, while in their remaining three points they complain —in as many specific particulars—of the receipt by the court of certain testimony.

Without refining upon it, the controlling question the appeal presents is whether or not the trial court erred in its challenged holding as to the sufficiency of the evidence, which, as shown by its judgment, was in his verbis as follows:

"The court is of the opinion that no issuable fact was raised by the testimony, and that the testimony offered by plaintiffs and contestants does not raise any fact issue as to any of the grounds of attack made by them upon the said will; * * *

"And it appearing to the court from the undisputed evidence that the said William Hugh McCarn at the time of the execution of said will, to wit, on the 20th day of April, 1936, was more than twenty-one years of age, and of sound mind and had testamentary capacity, and that he is now dead; * * * that said William Hugh McCarn executed said will with the formalities and solemnities and under the circumstances required by law to make the same a valid will, and that the same is the last will and testament of said William Hugh McCarn."

After painstaking examination of the record, this court is unable to see eye-to-eye with appellants' attack upon the court's appraisal of the sufficiency of the evidence in either feature of the contest; to the contrary, it finds no testimony of any probative force tending to show exertion of any undue influence upon the testator in the execution of the will by any one of his named brothers, or any other person; nor does it find more than a scintilla or surmise—if that much—as to any lack of tes-

tamentary capacity to execute the declared-upon instrument as his will by the testator at the very time of its execution.

■ These conclusions will be commented upon in inverse order of their presentment, that is, the claim of undue influence first.

Although assembled in their brief by the appellees, it is thought the undisputed evidence shows these were, in material substance, the circumstances under which this will was executed.

"On the day of the execution of the will offered for probate, April 20, 1936, the testator, alone, walked into the drug store owned by his friend and tenant, W. R. Clayton, and requested Mr. Clayton and his clerk, Mr. Hodges, to sign it as witnesses, and stated to them that it was his will; testator signed the instrument in the presence of both the witnesses, and there was nothing unusual in his manner or acts, and Clayton testified that—in his opinion—at the time the testator executed the instrument he was of sound mind, and that the will had never been revoked. After the execution of his will, testator discussed with his close friends, Mr. Cohen and Mr. Weiner, and his sister-in-law, Mrs. Oscar McCarn, the manner in which he had disposed of his property, stating with reference to his daughter that he was going to leave her enough 'so that she wouldn't go hungry', and that, because of her treatment of him, he was going to provide for her only in 'a limited manner and that was all he was going to do.' "

"The evidence also shows without dispute that none of the beneficiaries under with the 1934 will, or the 1936 will, were present at the time of their execution; that in each instance the testator himself requested the attesting witnesses to sign his will with him. The witnesses were totally disinterested, and there is no express or direct testimony in the entire statement of facts showing that any beneficiary requested the testator to make a will, or in any manner undertook to influence or affect his decision. There is no testimony that the testator relied upon the judgment of any of the beneficiaries, or requested their opinions, or advice, about the making of his will, or any provision therein. The fact that testator fully understood the provisions of both of such wills, before and after making them, likewise appears to be undisputed."

The law upon the legal equivalent of these facts, as affecting the claim of undue influence upon a testator, seems to be authoritatively settled in Texas in these, among other, holdings, to-wit: In re Bartels' Estate, Tex.Civ.App., 164 S.W. 859; Mayes v. Mayes, Tex.Civ.App., 159 S.W. 919; Wilson v. Paulus, Tex.Com.App., 15 S.W.2d 571; McKenzie v. Grant, Tex.Civ. App., 93 S.W.2d 1160.

Appellants' contention upon this phase, thus stated by them in their brief, that "where a parent disinherits a child for a stranger or for collateral kin, that fact alone (coupled with opportunity) will make a jury-issue upon the question of undue influence, if not mental incapacity," which proposition is by them limited "to cases where the disinheritance was in favor of collateral kindred and strangers", is not considered to be the law in Texas, as declared in the authorities just cited; neither, it seems, did this court make any contrary statement of the rule, as appellants appear to think, in Rudersdorf v. Bowers, Tex.Civ.App., 112 S.W.2d 784; quite the contrary. It would serve no useful purpose to restate here the rationale of that decision, which had to do only with the question of testamentary capacity, since it clearly appears therefrom that it furnishes no authority for appellants' stated contention, even as affects the issue of mental incapacity, to say nothing of the further one here involved, of undue influence.

■ Indeed, this court does not find the law to have been so declared in Texas, as appellants' quoted and qualified statement puts it, upon either the question of undue influence or mental incapacity. Rather did this court, through its late Chief Justice Pleasants, in the Bartels case, directly declare the rule to be the other way—specifically as related to a claim of undue influence in the execution of a will—as follows [164 S.W. 866]: "Undue influence cannot be predicated alone upon the fact that the will is unfair or unjust in some of its provisions, and for that reason unnatural. There must, in addition to this, be some evidence direct or circumstantial tending to show that some person in whom the deceased imposed confidence and trust, and who was in a position to exercise influence over the mind of the testator, exercised that influence in dictating the disposition of the property made by the will."

As appears from the statement, supra, of the facts shown here, there was no ev-

idence that any person even sought to exercise any influence—due or undue—over this testator in the making of this will.

The evidence affecting the mental condition, or more concretely speaking, the testamentary capacity of this testator, while not utterly bereft of any circumstance tending to show what his mental state was, as was the case with reference to whether undue influence was exerted upon him, is still just as convincingly shown not to have disclosed, or even to have reasonably and legitimately indicated, that he lacked the capacity to legally execute this will.

These among other considerations compel that conclusion from the record as a whole, to-wit:

(1) Of the nine witnesses appellants presented in substantiation of their claim of lack of mental capacity only four, Messrs. D. Knodel, Carl Goudeux, Frank Holmes, and Mrs. W. E. Hardy, even gave expressions to the purport that the testator was, to use their own phrase, "of unsound mind".

Furthermore, in the opinion of this court, each and all of these four, on cross-examination, were conclusively shown either, (a) to have been in no position to properly express an admissible layman's opinion as to the testamentary capacity of the testator at the very time of the execution by him of the will in suit, in that they based their expressions that he was "of unsound mind" wholly upon such trivial personal characteristics and actions of his as—under the settled rules of law in Texas—had no probative force of any legal consequence on the issue of testamentary capacity, as it was declared upon and tried in this instance, or (b) to have therein uttered abstractions that were intrinsically insufficient.

The record is bulky, hence it would be beyond the requirements to detail the great volume of testimony the trial court patiently heard on this feature from all the witnesses, including that from the four last named. But the gist of theirs—along with that of the medical expert's—is thus epitomized:

The only medical testimony was that of Dr. Charles Fred Harris, in effect that he treated the testator in April of 1934 for erysipelas; that he recovered from it, and that it did not affect his mind—that he was a perfectly normal man mentally; that he again attended the testator in April, 1942,

during his last illness, in which the testator was suffering from a stroke of apoplexy, until the time of his death on April 3rd, and that during all of that time, until he became unconscious, there was no affectation whatever of the testator's mental faculties.

Mr. D. Knodel, one of the four referred to, testified that in the early part of 1942 the testator hold him that his brother, Jeff McCarn, drew his will and that he was not worried, and "wasn't troubled about it." Knodel was a notary public and testified that he had taken the testator's acknowledgments of legal instruments on many occasions since the year 1938, and on others as far back as 1928 or 1929, and that he would not have taken such acknowledgments if he had thought the testator was of unsound mind. He testified on direct examination that on or about April 20, 1936, "I wouldn't say that he (the testator) was a man of sound mind." On cross-examination, when asked to fix any particular time when he thought the testator was not of sound mind, he confessed he could not do it, did not know when McCarn had signed the will, had never said that he did not know what he was doing when he signed it, and concluded with this: "Well, I don't know when he signed it, and I can't say that at the moment he signed that will he was of unsound mind or wasn't."

Mr. Carl Goudeux, another of the four, testified that he operated a sandwich shop; that he had known the testator since 1929; that the testator often ate his meals at his restaurant; that he had seen the testator under the influence of intoxicating liquor; that on one occasion the testator left his change on the restaurant counter; that he dressed "very poorly for a man of his means", but flatly refused to testify that the testator was crazy. On cross-examination he concluded as follows:

"Q. You don't know whether he was sane or in possession of all of his faculties, or was of sound mind when he signed this will on April 20, 1936, do you? A. No, I don't know anything about it.

"Q. You just simply don't know anything about that? A. No, about his will."

Mr. John H. Cooke, who testified that he knew the testator about twenty years, stated that in his business dealings, the testator at all times understood his business affairs.

Mrs. W. E. Hardy, another of the four, who was shown to have lived elsewhere away from Houston from 1933 to 1938, and only visited in Houston on occasions, stated that the testator was "of unsound mind", although she admitted that she did not know that he looked after his own property, and collected his own rents, etc. She admitted, on cross-examination, that the testator could have been a very good business man without her having known about it, and that in the course of negotiations with him in 1942 for the purchase of four houses from him she dealt with him as with any person in full possession of his faculties, and felt no hesitancy whatsoever in negotiating with him as a perfectly normal person.

Mr. Frank Holmes, the last of the four, who had never had any business transactions with the testator, but occasionally drank beer with him, testified that he had seen the testator under the influence of intoxicating liquor on some occasions, that he burned wood in his stove in his home, and that, although he didn't "believe he was of sound mind", he did not mind in the least drinking with the testator and borrowing small sums of money from him. He knew nothing about the testator's business, and was unable to say whether he handled his affairs capably or not.

Moreover, it may be added—without intimation of any lack of good faith on the part of either—that two of these four witnesses, Mr. Knodel and Mrs. Hardy, frankly testified that—right along up to and even subsequent to the execution of this will by him—they had had real estate and other business dealings with him, and always regarded him as a person of sound mind; hence they had not considered they were doing any questionable thing in so engaging in the transactions they detailed having had with him at such times.

The overwhelming weight of all other testimony on either side than that of the four grouped witnesses, who so used the expressions "of unsound mind", was to the purport that the testator, up to his final loss of consciousness in dying six years after he had executed his will, was not only a normal man mentally—as Dr. Harris put it—fully capable of legally executing any contract or document—including this will —but also a self-contained and able business man, who fully understood what his large properties were, who were his contractees, and especially all about all those who were or were to become the objects of his bounty.

The will names appellee Trust Company as independent executor and trustee; directs the payment of $30 per month to testator's daughter during her life; makes a provision for monthly payments to Miss Maud Keen, long his employee, and provides that the residue of the estate be held, managed, and controlled by the trustee for the benefit of the testator's three brothers, Jeff McCarn, John Alvin McCarn, and Daniel Oscar McCarn.

It further provides that none of the real estate should be disposed of, sold, or encumbered, within a period of twenty-one years after the death of the survivor of the testator's three brothers, and directed that any beneficiary who should institute any proceeding in any court for the purpose of setting aside or breaking the will should forfeit any or all benefits, bequests, and devises therein provided for him or her.

■ Under the facts stated, these authorities support the trial court's holding that the evidence in this instance shows, as a matter of law, that this testator did have the requisite testamentary capacity at the time he so executed this will: Rudersdorf v. Bowers, Tex.Civ.App., 112 S.W.2d 784; Stolle v. Kanetzky, Tex.Civ.App., 220 S.W. 557; Id., Tex.Civ.App., 238 S.W. 724; Id., Tex.Civ.App., 259 S.W. 657; In re Bartel's Estate, Tex.Civ.App., 164 S.W. 859; Milner v. Sims, Tex.Civ.App., 171 S. W. 784; Vaughan v. Malone, Tex.Civ.App., 211 S.W. 292; Hodges v. French, Tex.Civ. App., 256 S.W. 662; Payne v. Chance, Tex. Civ.App., 4 S.W.2d 328; Daley v. Whiteacre, Tex.Civ.App., 207 S.W. 350.

The appellants earnestly, though both original and reply-briefs, as well as in able oral arguments at the bar, urge that this disposition of his property by the father was an unnatural one, in that it disinherited his daughter, in favor of his brothers, their children, and his friend and employee, Miss Keen. But in their zeal of advocacy they apparently overlook the fact that he did not in fact disinherit the daughter— rather he provided a cash income for life for her of $30 per month, and that in spite of indisputable and conclusive evidence that she had—throughout his life after she came to an age of responsibility—so wholly neglected him and refused to respond to his overtures and protestations of paternal affection for her as to thereby cause not only an estrangement between them, but

also to engender a bitterness toward her within himself that only died with him.

Under the authorities already cited, this factual development fully accounted for, or "explained", any "unnaturalness" that may otherwise have been inferable from the face of a will that apparently was a carefully discriminating one in its every feature.

None of the challenged rulings in admitting evidence are thought to involve reversible error; the carbon copy of a letter from the testator to his daughter, containing on its face an original notation signed by him, was admissible as a declaration by him as showing his mental attitude toward the daughter, she having already received the original letter and the notation on the copy itself being an original; for a like reason, Mrs. Alvin McCarn's testimony as to declarations he made to her about a trip he had made to Louisiana to visit his daughter was receivable. McCormick & Ray, Texas Law of Evidence, page 528; Johnson v. Brown, 51 Tex. 65; Robinson v. Stuart, 73 Tex. 267, 11 S.W. 275; Sockwell v. Sockwell, Tex. Civ.App., 166 S.W. 1188; Jones v. Selman, Tex.Civ.App., 109 S.W.2d 1003; Shepherd v. Stearns, Tex.Civ.App., 45 S.W.2d 246; McElroy v. Phink, 97 Tex. 147, 76 S.W. 753, 77 S.W. 1025.

Lastly, the opinion of Mr. Fincher, the testator's banker and confidential friend for the last thirty years of his life, that an apparent shakiness in the latter's signature to several checks in evidence had no effect whatever upon testator's mental condition, was clearly admissible.

These conclusions require an affirmance of the judgment; it will be so ordered.

Affirmed.