**GARCIA et al. v. GALINDO.**

No. 11516.

Court of Civil Appeals of Texas. San Antonio.

June 20, 1945.

Rehearing Denied July 18, 1945.

Perkins & Floyd, of Alice, and J. W. Wilson, of Falfurrias, for appellant.

Lloyd & Lloyd, of Alice, for appellee.

NORVELL, Justice.

Manuel and Adolfo Garcia sought to probate an instrument purporting to be the last will and testament of their deceased brother, Daniel Garcia. Fidela Garcia de Galindo, a daughter of said Daniel Garcia, contested the application for probate. She was unsuccessful in the County Court, but judgment was rendered refusing probate of the will in the District Court.

The jury finding upon which the judgment is based was as follows:

"Do you find from a preponderance of the evidence that Daniel Garcia was of sound mind at the time he executed the will dated December 28, 1942?

"We, the jury, answer: No."

No objection was made to the issue as submitted, nor was a definition of the term "sound mind" requested or given. As used in Article 8281, Vernon's Ann.Civ. Statutes, the term "being of sound mind" means "having testamentary capacity." Rutherford v. Robbins, Tex.Com.App., 298 S.W. 549, holding approved by the Supreme Court, wherein a definition of testamentary capacity is set forth. Whether, in reviewing this case, we accept the term "sound mind" as used in the trial court's charge as meaning "testamentary capacity" or "sanity" or some other commonly accepted meaning (24 Tex.Jur. 372), we are of the opinion that the jury's finding is so against the overwhelming preponderance of the evidence as to be clearly wrong. 3 Tex.Jur. 1097, § 769.

At the time of his death, on July 27, 1944, Daniel Garcia was about seventy-five years of age, and had been blind for some fifteen years. He had been married twice. The appellee was the only surviving child of the first marriage. The second marriage was childless. For some time Daniel Garcia lived with his daughter, but unhappy differences arose between them, with the result that Daniel Garcia left his daughter and went to live with his brothers, the appellants here. It also appears that after leaving his daughter Daniel Garcia engaged in litigation with her over property in which they both asserted an interest.

According to the testimony of G. C. Mann, Esq., a practicing attorney of Lare-

do, Texas, Daniel Garcia came to his office in Laredo in December of 1942 and instructed him to prepare a will for him. Mr. Mann prepared the will, which is the one offered for probate. The import of Mann's testimony was that Garcia knew the nature and extent of his property and had definite ideas concerning its disposal. Garcia was particularly adament in his expressed attitude toward his daughter, the appellee here. He did not want her to have any of his property. While Mann did not testify directly that in his opinion Daniel Garcia was sane, the facts and circumstances detailed by Mann point conclusively to the fact that Daniel Garcia was sane and possessed of testamentary capacity at the time the instructions relating to the drawing of the will were given. Mr. Mann was not impeached in any way.

The will was signed by Daniel Garcia on December 28, 1942, in the presence of four subscribing witnesses. In addition to the subscribing witnesses there were also present Mr. J. W. Wilson, Esq., a practicing attorney of Falfurrias, Texas (where the will was executed), and his secretary, Manuela Lopez. All of those present at that time, with the exception of one of the subscribing witnesses who pre-deceased Daniel Garcia, testified upon the trial. They all testified that in their opinion Daniel Garcia was of sound mind. The will was read and translated into Spanish by Miss Manuela Lopez. Mr. Wilson testified as follows: "I asked him then if he knew what was in the will and he said he knew what he had ordered put in it but he wanted it read to him and to the other witnesses, so that he could identify it as being what he desired to do at that time, and I requested my Secretary, Miss Lopez, to read the will and translate it to him. * * * She did. And then I passed the will to the other persons in the room, Mr. Viscaya, Mr. Olivarez, Mr. Luna and Doctor De Hoyos, and they read it, and Mr. Daniel Garcia said that he desired to sign it. I had my fountain pen with me and he signed it and stated that that was exactly as he had ordered it prepared and exactly as he wished his will to be. And after signing it he requested that the four witnesses sign it."

The subscribing witness De Hoyos was a medical doctor and testified that he knew that questions of testamentary capacity frequently arose in connection with the execution of wills, and for that reason he asked Daniel Garcia a number of questions which were relatively simple in nature, and thus convinced himself that Daniel Garcia was of sound mind and knew what he was doing. Some of the witnesses present at the time were more detailed than others in their description of the transaction, but there was no substantial conflict among them and all were agreed that despite his age and the disability of blindness, Daniel Garcia was sane and knew what he was doing and what he wanted to do. These witnesses were not impeached in any way.

No witness testified that in his opinion Daniel Garcia was an insane person. The nearest approach to something of this nature was the testimony of one of appellee's witnesses, Vicente Lopez, as follows:

"Q. Did you have occasion to observe the old man's mental condition? A. Yes, sir.

"Q. In what condition was he? A. There were times when he would talk about cows and then he would start to talking about something else.

"Q. In other words there were times when he was normal and times when you did not think he was normal? Is that what you mean? A. There were times when he was normal and you could not notice anything.

"Q. What made you think that there was something abnormal or something wrong with his mind, if you did think so. What did you observe or see there? A. Because he would be talking about something and he would change the course of the conversation and would get mad.

"'Q. His mind would wander? Is that what you mean? A. Something like that.

"Q. During those times that you were talking about would you say that he was not of normal mind? A. That is what I believed."

Another of appellee's witnesses, Estevan Garcia, testified as follows:

"Q. Could you tell anything about his mental condition from his age and condition at that time? A. Well, his way of answering his mind was correct. * * *

"Q. Was his mind normal or abnormal at that time? A. Normal.

"Q. How long,—was that true all of the time that you were there or not? A. There were times when he was normal and there were times when he was abnormal.

"Q. When were the times that he was not normal, and what indicated to you that he was not normal? A. Because at times he would say one thing and then would say another.

"Q. Would change the subject quickly? A. Yes, sir."

This being the state of the evidence, the verdict can not stand. In our opinion the following authorities support our holding upon the point: Salinas v. Garcia, Tex. Civ.App., 135 S.W. 588; Stolle v. Kanetzky, Tex.Civ.App., 220 S.W. 557; Hodges v. French, Tex.Civ.App., 256 S.W. 662; Vaughan v. Malone, Tex.Civ.App., 211 S. W. 292; Jones v. Milam (Re: Bartel's Estate), Tex.Civ.App., 164 S.W. 859; Cameron v. Houston Land & Trust Co., Tex. Civ.App., 175 S.W.2d 468.

In view of another trial, we will pass upon appellee's cross-assignment of error. In the County Court Rodolfo Galindo joined his wife in contesting the application for the probate of the will. However, when the case reached the District Court Galindo filed a disclaimer of all interest in the property involved and refused to join his wife in the contest. The district judge then entered an order dismissing Rodolfo Galindo from the suit and authorizing the appellee to proceed with her contest alone.

██ Upon the trial, the appellee tendered her husband as a witness in her behalf. His testimony was, however, excluded by the court upon appellants' objection that Galindo was precluded from testifying as to transactions with the decedent by the terms of the "dead man's statute," Article 3716, Vernon's Ann.Civ. Stats.

We are of the opinion that the trial court did not err in the ruling complained of. A husband is a necessary party to a suit involving the wife's separate property. Articles 1983, 1984 and 1985, Vernon's Ann. Civ.Stats.; Wade v. Wade, 140 Tex. 329, 167 S.W.2d 1008; Tannehill v. Tannehill, Tex.Civ.App., 171 S.W. 1050. On the other hand, the wife is not a necessary party to a suit involving the separate property of the husband, and consequently it has been held in a will contest that the wife of a beneficiary under the will may testify as to transactions with the decedent. Mitchell v. Deane, Tex.Com.App., 10 S.W.2d 717. Under the authority last cited it would

seem that neither the husband or the wife would have a present vested interest in the separate estate of the other which would place them within the bar of the statute, although there are certain expressions in Tannehill v. Tannehill which seemingly point to a contrary conclusion. We view Galindo's disclaimer of any property interest in his wife's separate estate as being largely immaterial. Appellee, however, insists that by reason of his refusal to join in the contest, and the court's resultant order dismissing him from the suit, Galindo ceased to be a "party" within the meaning of that term as used in Article 3716.

Article 1983 reads as follows: "The husband may sue either alone or jointly with his wife for the recovery of the separate property of the wife; and, in case he fails or neglects so to do, she may sue alone by authority of the court."

In Crenshaw v. Newell, Tex.Civ.App., 147 S.W.2d 523, it was pointed out that the purpose of the latter part of the statute quoted was to protect the wife's separate property and to prevent her from being deprived of the right to recover the same by legal action by some unwarranted dereliction on the part of the husband. We feel safe in saying that the Legislature never intended that this statutory provision should serve as a means whereby an otherwise disqualified witness under Article 3716 could be rendered competent under the provisions of said article. While there are cases holding that the disqualification of a witness may be removed by a transfer of or disclaimer to the property which is the subject matter of the suit, these transfers or disclaimers are voluntary actions whose effectiveness in relation to property does not depend upon court action in accordance with a statutory proviso which in an unusual situation is designed to obviate a hardship or injustice that would otherwise take place. The law contemplates that the husband will be a party to a suit affecting the separate estate of the wife. His testimony comes within the bar of the "dead man's statute," and this rule of exclusion is the same whether he actually joins in the suit, or through some unwarranted dereliction fails to do so.

The judgment of the trial court is reversed and the cause remanded for new trial.