## MATLOCK v. MATLOCK.
### No. 10002.

Court of Civil Appeals of Texas. Austin.

Dec. 19, 1951.

Rehearing Denied Jan. 9, 1952.

Woodruff & Holloway, Brownwood, Sam McCollum, S. W. Hughes, both of Brady, R. R. Holloway, Brownwood, of counsel, for appellant.

Senterfitt, Crump & Jameson, San Saba, for appellee.

HUGHES, Justice.

This is a will contest. The testator was J. M. (Jim) Matlock. Appellant, Mattie Matlock, is the widow of testator and sole beneficiary under his purported will. Raymond Matlock, appellee, is the contestant and is the son and only surviving child of testator by a former marriage. Appellant and testator had no children.

This suit was originally instituted in the County Court of San Saba County and from a judgment admitting the will to probate an appeal was taken by appellee to the District Court of San Saba County. A jury trial in that court resulted in a verdict that testator was of unsound mind on May 29, 1945, the date of the purported will.

In accordance with this verdict judgment was rendered annulling the judgment of the County Court admitting the will to probate and cancelling other orders made by that court in connection with the will.

Appellant makes only one assignment of error which is that the verdict of the jury is so contrary to the great preponderance of the evidence that it should be set aside.

J. M. Matlock died December 29, 1949, at the age of 69. He and appellant had been married to each other for about 40 years. All of the property which they owned had been acquired by them during the marriage and belonged to the community estate. The extent or value of the estate is not shown but for the most part it seems to have consisted of land and livestock.

Testator and the mother of appellee were divorced when he was about six years old and appellee, as a child, lived with his mother. He is now married having two children, a girl 29 and a boy 26. He has lived in Houston for the past 28 years and visited his father in 1917, '19, '21, '23, '35, '39, '45, '46, '48 and '49.

The will in question was signed on May 29, 1945, in the office of J. K. Baker, a prominent attorney of San Saba who was deceased at the time of this trial. Present when the will was signed were testator, his wife, Judge Baker and the two witnesses to the will A. L. Taylor and E. E. Fagg.

On the same date and on the same occasion appellant executed a will before the same witnesses by the terms of which she left all of her property to her husband, Jim Matlock.

We have carefully read the entire statement of facts and will now, as briefly as possible, summarize the relevant testimony of appellee's witnesses.

Raymond Matlock appellee:

Witness attributed the following statements to appellant regarding his father's condition from "'47 or '45 on":

"Well, she said that she couldn't hardly understand how he was talking, and said he was in a bad shape, and such things as that, said she couldn't do anything with him

and he wouldn't do what the doctor told her to do—doctor may tell her today to keep him in bed, and said he wouldn't do it.

"* * * I don't know exactly what I should give about the exact words that was carried on there, but it was along those lines, about the condition he was in, he didn't want to do what he was told, and such things as that. He wasn't able to do anything, if that's what you—. Said she had to have somebody to do the work, and she had someone hired to do that."

Appellee was not asked his opinion of his father's mental capacity.

Clemuel P. Gober:

Mr. Gober had known decedent since he, witness, was a small boy and had worked for him at various times, including April, 1945, when the following incident occurred: "Well, the three of us were riding, and we met at a field fence on the south side of the pasture, the Dr. Matlock place—on the Susan Matlock place, and we had met there to start back to the house, and after meeting and deciding there was no further use to ride, we started to the house, and we were riding along in single file, I believe Mr. Matlock ahead of us, and he started to sway in the saddle. He first fell kind of forward, then he began to lean back, and we saw that he was going to fall, and got off our horses to help him, stop him from falling, and we laid him on the grass and kept him there until they brought a car. * * * when we pulled him out of the saddle, he had a death grip on the horn of the saddle, and his eyes were without expression, they were set in his head, and he was very pale, and seemed to be breathing hard.

"Q. I'll ask you to state whether or not he was able to converse with you at that time? A. No, sir, he was not."

This witness had no "more dealings" with decedent after this incident and was not asked to express an opinion as to his mental capacity.

Earl Stover:

This witness had known decedent for 41 years and since 1940 had worked for him a few weeks at the time about twice a year. He testified to the same incident

related by Mr. Gober, differing only in minor details. On the night of this incident witness saw decedent again and testified:

"Q. And I will ask you to describe for us what his physical condition appeared to be at that time? * * * A. Well, I had noticed his mouth being drawn, but I don't know particularly that night.

"Q. When you had noticed it, was it prior to this occasion or after this occasion that you noticed his mouth being drawn? A. After."

This witness also saw decedent after he was "up and around from this illness" and concerning his physical condition at that time testified:

"A. Well, he was short-winded, and more disabled, seemed like.

"Q. By 'disabled', could you describe for us just what type of disability, and how it appeared to you? A. Well, more or less, he didn't seem like he—he didn't care for his stock, or something like he should, conversations were broken, seemed like a little.

"Q. In his conversations, I will ask you to describe how his words were formed with regard to plainness or otherwise. A. Well, Jim Matlock, knowing my age, he would probably mention things that maybe happened before I was born, and something like that, I shouldn't know.

"Q. Was he able to speak distinctly? A. Well, not exactly."

This witness also testified that following this illness of decedent he seemed to lose interest in his business and neglected the feeding of his cattle and that he carelessly let a calf attack him. Mr. Stover also testified:

"Q. Earl, I will ask you to state whether or not you have ever had occasion to observe Mr. Matlock meeting people coming on his place with a shotgun in his hands? A. Well, I have a few times, yes.

"Q. Well, describe what happened on those occasions, just how— A. Oh, just more or less drive up, why, when you came up, why, that would be the first thing you would see was probably a gun sticking out around the door facing, or something like that.

"Q. State whether or not he actually aimed a gun at anybody on those occasions that you observed. A. Well, I wouldn't think so."

This witness was unable to express an opinion as to the mental capacity of decedent on the date of the will's execution.

On cross-examination it was developed that this witness worked for decedent following the 1945 illness and had had many conversations with him.

Clark Matlock, brother of decedent:

This witness lived in Brownwood and visited decedent about twice a year since 1921. He testified:

That he visited testator in 1943 and "it seemed to me like he had had a stroke of paralysis; that his physical appearance was bad * * * he couldn't hardly walk in his right leg. His hands were useless to him * * * and * * * the corner of his mouth was drawed down * * it was drawed about enough whenever he would go to drink milk, it would run down the corner of his mouth on that side, it would run down inside his shirt at times."

Witness next saw testator in 1945 and said his condition was worse. He could hardly understand his speech. "It seemed like his tongue was thick"; that "he would be carrying on a conversation with you and he would just—well, say, maybe when he would start talking again he would be talking about something else. He was forgetful, that's what I would call it."

He testified that testator had crying spells, for no apparent reason, which would last 4 or 5 minutes and that those spells occurred every hour. On this visit witness testified that testator would wake him three or four times during the night to show him an old pistol.

In 1946 witness visited testator again and when asked concerning his physical condition at that time stated that it was "about the same proposition."

Witness said that appellant made the following statements regarding her husband: "Well, she told me in 1946, sometime in 1946, Jim was getting in bad shape. Jack Guthrie at that time, him and his wife were sitting with her, and I told her, I

said, 'Now, if you get to need any help to take care of Jim, let me know' and she said she would. She said, 'Jim is getting in bad shape, and Jim is getting dangerous.' * * * I couldn't give you the date, but she told me Jim was getting 'plumb' dangerous, and she wished something could be done about them old guns around there."

The date of this last statement was later fixed as early 1948 or late 1947.

This witness further testified:

"Q. Now, Mr. Matlock, based upon what you have just testified to and your observations of your brother, I will ask you to state what your opinion of his mental state was along about May 29, 1945? A. I think it was bad.

"Q. By bad—could you elaborate on that a little bit? A. Yes, sir, I don't think a man that is at himself, that is just exactly right in every respect, will sit down and break down and cry before folks."

On cross-examination the witness testified:

"Q. Now, as a matter of fact, don't you know this to be a fact, that it was in 1948 he had that paralysis? A. No, no. He had some kind of spell in 1945, like to fell off a horse down there.

"Q. And that's what you're talking about as paralysis, when he nearly fell of—the horse? A. That's right, that's what I called it, yes, sir.

"Q. That's what you are fixing as the date of his paralysis? A. That's what I am calling it.

"Q. And your idea is that after he nearly fell off that horse, why, from then on, he couldn't use his right hand? A. Well, he didn't, when I seen him he didn't; I'll say he didn't.

"Q. And that is the way you fix this paralysis business, was the date he nearly fell off his horse? A. That's right. That's when I think he had the first stroke, right there."

In 1935 or 1936 decedent told witness that he would not make a will as long as he was in his right mind and that this statement was repeated every year or so up to 1948.

Mrs. Ora Matlock, wife of Clark Matlock:

Witness testified to the following conversation with appellant in 1943 or 1944:

"Q. Did Mattie make any reference as to Jim Matlock's mental and physical condition at that time to you? A. She did. She said that she was worried about Jim. Said she was afraid that Jim's mind was not right. She said he would go out in the pasture and stay and she would get uneasy about him, and she would have to go and hunt him, she said she never did know if she was going to find him dead or if he had had one of those spells and was down and couldn't get home. She said it just kept her worried all the time."

And the following conversation after 1945: "She told me she was afraid Jim—that she believed Jim was losing his mind. She said, 'Ora, I haven't had a good nights sleep in over three years. I am afraid to go to sleep, because I am afraid Jim will hurt me or hurt himself.' "

With reference to decedent's condition in 1945 she testified: "Jim was sick. There was something wrong with him. He couldn't use his leg and his arm. He couldn't hold a knife. He couldn't hold a fork. And when he would try to drink milk, it would run down out of his mouth, and he couldn't hold things, he couldn't hold a glass of milk, he would drop it a lot of times, and he couldn't use his legs. * * * Well, there was several of us there in the house at the time, and he would be talking about—just carrying on a conversation about things in general, and directly he just dropped his head like that (exhibiting), and he would hush, and when he would start to talking again, maybe it would be altogether different, an altogether different subject, and then sometimes he would be talking, he would just break down, he would cry, he would cry like a baby. I have seen him cry a lot of times, and then want to know if I didn't know what was the matter with him. * * * His mouth was drawn down, one corner of his mouth was drawn down. * * * He couldn't hold his spoon. He would take his spoon and try to feed himself. We were there for lunch and Mattie had to help him to feed himself. because he

couldn't hold his knife, he couldn't hold his fork, he would drop it when he would try to hold it, he couldn't hold his knife, he couldn't hold his fork, he would drop it when he would try to hold it, he couldn't pick up a glass and hold it, he couldn't drink his milk, swallow it, he would put in his mouth, but it ran down out of the corner of his mouth.

"Q. Now, then Mrs. Matlock, based upon your observations of Jim Matlock on the occasion in question, as to the way he talked and the way he acted, all of that, what is your opinion as to Jim Matlock's mental condition on May 29, 1945? A. Well, I still say he had an unbalanced mind."

Oliver Wilborn:

This witness testified to decedent's physical appearance in 1948 and 1949, as evidencing some paralysis. He also testified:

"Q. Now, during the conversation you had with him, just how would he talk? In other words, what was his manner of speech? A. Well, at times he talked all right. At times it was a little hard to understand him.

"Q. Did he follow your train of thought and your conversation while you were talking? A. Well, he seemed to, most of the time.

"Q. Now, did you observe him breaking down and having any crying spells during the time you observed him? A. Yes, sir.

"Q. All right. Could you describe those for the jury very briefly? A. Well, wasn't anything to it, only just talking and he would start crying.

"Q. How long would those last? A. Oh, just a minute, two minutes maybe, not very long.

"Q. Did they appear to come with any regularity? A. No, sir, I don't think so."

This witness was not asked and did not give an opinion as to the mental capacity of decedent.

Stephen Brown:

Witness worked for decedent after 1940 and testified that he was crippled in one arm and leg, and that he had difficulty in talking. He gave no opinion of decedent's mental condition.

John Stoner:

Witness worked for decedent in 1947 and 1948. He testified:

"A. Well, the last few years I couldn't call to mind the time but what he come to the door with his gun. Of course, now, he never did use it. Of course, a fellow feels a little shakey though. He had his gun, I don't know what his intentions was.

"Q. Now, then, what was the manner of Jim Matlock's conversation at the time you talked to him? A. Well, I couldn't call to mind just what it was, but he had— seemed like he would start off all right, but it seemed like he would kind of get off, I don't know.

"Q. Did you ever see Jim Matlock crying? A. Once or twice I have.

"Q. State to the jury just how that came about, whether it was during his conversation, or how? A. Well, I couldn't say what he was talking about now, I just knew it was a little out of the ordinary, him crying that way, but I don't recall to mind just what the subject was now of the conversation.

He quoted appellant as saying: "* * * she made the remark she didn't know what she was going to do with him at times, he was such a bad."

This witness was not asked his opinion of decedent's mental condition.

Luther Matlock, second cousin of decedent:

Witness testified:

"Well, I don't remember just when he had a stroke or something of that kind, I couldn't give you what year that was. That affected his right arm—I believe it was the right side. But the other times, his condition, I'd say in 1940, when he went to, you know, to failing, weakening.

"Q. Now, when you mentioned a stroke or whatever it was, what was his physical condition after that time? In other words, how did he appear? A. Well, I couldn't say. I don't know. He just kind of lost use of himself a little bit, his talk and using his right arm, his right side, a little

bit. * * * he got to kind of tottering, all right, but I don't know just whether that was from the stroke or not, I wouldn't say.

"Q. You mentioned something regarding his conversation. Would you describe for us his conversation? A. Well, he would start off to talking about something, but it would look like his mind would leave him for a period of time. Directly he would start on something else, on a different subject.

"Q. Was it difficult to understand his words, or otherwise? A. I could understand them pretty good.

"Q. Now, I will ask you to state to the jury whether or not you have observed Mr. Matlock breaking down and having crying spells? A. Yes, he done that a lot."

With reference to a cattle deal with decedent he testified: "* * * he never did know what he was out there for. My brother was with me at the time, and we just got away when we seen what happened."

When asked about decedent's mental state on May 29, 1945, witness testified:

"A. Well, there were times, lots of times in late years that he wouldn't have been qualified to tend to any business, different occasions. I don't know whether that answers your question or not?

"Q. Well, I asked the question as to what your opinion was on him, as to his mental condition May 29, 1945. I wanted to know whether you could answer that or not? A. Oh, you mean that particular year?

"Q. As to that particular date, based on your observations of him. A. I would say it wouldn't a lot of times, but on that particular time, I don't know that I met him on that particular date."

Mrs. J. B. Stewart:

Witness visited decedent's home in 1945. He was then sick in bed. Witness at such time formed no opinion of his mental condition. She saw decedent again in 1946 and at that time she said he did not seem to have the use of his right foot and that she could hardly understand his speech.

"I had to pay real close attention to be able to understand him."

She quoted appellant as saying "he (decedent) might burn the house down; said you couldn't tell what he would do."

Witness also testified to decedent's failing condition through the years 1947, 1948, and 1949 and that in '49 she had seen him come to the door with a gun. She gave no opinion as to his mental capacity.

Dr. R. C. Felts, a medical doctor:

Dr. Felts examined decedent on April 1, 1945, and diagnosed the patient as suffering from a coronary disease. This diagnosis was based upon the symptoms related by the patient and the doctor at that time saw no evidence of any other illness. He further testified:

"Q. Now, Doctor, I will ask you this: Assuming that a man has these symptoms, that he tends to fall, although he may not fall, that he isn't conscious, that at the time he is unconscious he is observed with pale face, that he is observed about the same time with his face drawn somewhat to one side, that he has the use of an arm and a leg impaired, and that he is observed to speak indistinctly, and saliva drips from, possibly, the corner of his mouth, and subject to crying spells; now, what would be a proper diagnosis based upon those symptoms that I have just related to you? A. It would sound like he had a cerebral accident.

"Q. By 'cerebral accident'—could you go into just the physiology of that? In other words, what has taken place? A. Hemorrhage of the brain, or tumor of the brain, or injury to the brain.

"Q. I see. Now, I will ask you to tell the jury what, in your opinion, would be the effect upon a man's brain and upon his ability to remember, and to keep track of his business, things of that nature, after such a cerebral accident. A. Well, sometimes it would impair his brain, his thinking, his reasoning—not always. Afterwards, after it's over, of course, he is unconscious—of course, he can't think then— but, following it, why, sometimes their mentality is impaired. * * * Well, if he exhibits those symptoms, the mentality

has been affected slightly. Is that what you mean? If he crys and drools at the mouth and all, well, his mentality is affected a little bit.

"Q. And he, as far as you could tell, he understood everything you said, didn't he, and as far as you could tell at that time, so far as you did observe, I will say, you observed nothing whatever wrong with him mentally, did you? A. That is right, except he was a little peculiar, I always thought.

"Q. You have always thought he was a little peculiar. A. Little peculiar.

"Q. You had known him before then, hadn't you? A. I think he had been in my office before then. First time he had ever been in my office he made a peculiar remark, but I think he is just a peculiar sort of fellow.

"Q. You didn't think he was of unsound mind, did you? A. No, sir.

"Q. Based on what you saw, now, if you had to say whether he was of sound mind or unsound mind, you would say so far as you could tell, he was of sound mind at that time, wasn't he? A. Yes, sir.

"Q. You never did see him when you thought he was of unsound mind, did you? A. No, no, sir.

"Q. How often did you see him, Doctor? A. I saw him in July of 1945, and then Doctor Farley saw him six months later, then I saw him 10 months later.

"Q. How many times did you see him in April of 45? A. Just the one time.

"Q. Did you see him in May? A. Not that I know of. I don't have a record.

"Q. You don't have a record of seeing him? A. Although I could have seen him, I went to his house to see him, a time or two that I don't have a record of on here."

Emmett Gober:

This witness testified that in 1946 appellant told him that decedent was "crazy"; also that he saw decedent come to the door of his house with a gun and that he had "a pretty wild look in his eye." The witness did not testify as to decedent's mentality.

Appellant put on the following witnesses all of whom testified that testator was of sound mind during the year 1945.

W. G. Locker, a lifelong resident of San Saba County and a lifelong acquaintance of testator and the owner of property adjoining him since 1928.

J. S. Matlock, age 69, cousin of testator.

B. R. Wilson, a lifelong resident of San Saba County and a neighbor of testator as long as witness could remember and who worked for testator in 1920's.

D. F. Brown, part-time preacher and farm worker, who had known testator for 30 years.

K. K. Taylor, stock farmer who had known testator for 30 years.

William Cowart, whose place was four miles from the Matlock home and who had known testator since 1904; this witness also testified that in March of 1945 testator told him that he was going to "fix his property so if anything happened to him that he would have it fixed" and that "he didn't want his son to have any of it" because "the boy never had anything to do with him much."

Jack Guthrie who had lived on a place adjoining the Matlocks since 1941. This witness also testified that in 1942 testator told him that "he wanted to fix up his business and leave it to the one that helped him make it, if something happened to him —leave it to his wife, Mattie."

This witness was with the witness Clemuel Gober and the witness Earl Stoner in 1945 when testator became ill while riding a horse. He testified that following this incident Mr. Matlock was not paralyzed until December, 1948, when he suffered a stroke at the dining table with witness seated beside him.

H. C. Brown, manager of the Peoples State Bank of Richland Springs. Testator had done business with this bank for at least 15 years before his death. This witness also identified numerous checks signed by the testator during the years 1945, '46 and '47 which were given for ordinary personal and business purposes.

Houston Lewis, a resident of Richland Springs for about 51 years, a garageman for the past 28 years with whom testator had traded the last four or five years of his life.

Coleman Burnham, farmer and Cashier of the San Saba National Bank, former Tax Collector and Assessor of San Saba County, a lifelong resident of that county and who had known testator since, at least 1936 or 1938.

A. L. Taylor, a lifelong resident of San Saba, Tax Assessor for San Saba Independent School District, a witness to the will who had known testator for 25 years.

Raymond Pearce of Richland Springs who had known testator since 1916 and had transacted considerable business with him.

Witnesses Claude Wilson and J. A. Harmon testified that in 1948 testator was normal both mentally and physically and they saw no indications that he was paralyzed at that time.

Dr. Wiley Jordan, a medical doctor, who has practiced medicine in Brady, Texas, for 22 years testified that he became well acquainted with testator in 1946, at which time he considered Mr. Matlock to be of sound mind.

This witness also testified:

"Q. When you saw him in 1946, did he have any evidence or appearance of having suffered a stroke? A. I saw no evidence of any paralysis at that time.

"Q. What is what is commonly known as a stroke? What is that term? A. A stroke came from apoplexy, that is, damage to the brain. That always—a stroke of apoplexy leaves some evidence of paralysis.

"Q. And you saw no evidence of that in '46? A. I didn't."

We need not detail the evidence but several of the witnesses for appellant, as to testator appearing at the door with a gun, testified that testator was somewhat of a prankster and that the display of guns was done in a joking manner and that they so understood it.

We also note that none of the witnesses for appellant, named above, observed any

signs that Mr. Matlock was paralyzed in 1945, 1946 or 1947.

It is conceded that testator suffered a stroke of paralysis in December 1949.[1]

We know of no way to fairly appraise an assignment such as the one before us in such manner as to properly reflect our holding except by setting out the substance of the material evidence. We have done this and do not now undertake a lengthy review because we believe a mere reading of the evidence sufficiently demonstrates the weakness of appellee's case. We do, however, emphasize these facts: only two of the ten or more witnesses offered by appellee expressed an opinion that testator was incompetent when the will was made and they were testator's brother and the brother's wife; appellee's own and only medical witness testified that testator was of sound mind at the time in question. He also refuted the hazy testimony of lay witnesses of appellee as to the nature of the testator's illness in 1945 and when the symptoms of paralysis appeared. This evidence was corroborated by the only other doctor who testified.

We also direct attention to the numerous unrelated disinterested witnesses, many of whom were lifelong neighbors or acquaintances of testator, who testified to his mental competency.

We have reached the conclusion that appellant's only assignment should be sustained because after having considered and weighed all of the evidence we are of the opinion that the verdict of the jury is so against the great weight and preponderance of the evidence as to be manifestly unjust. King v. King, Tex.Sup., 244 S.W.2d 660.

The judgment of the trial court is reversed and this cause is remanded.

Reversed and remanded.

On Appellee's Motion for Rehearing.

Appellee assigns as error our action in overruling his motion to affirm on certificate and in granting appellant's motion for an extension of time within which to file the record on appeal.

[1]. Some of the witnesses put this as occurring in December 1948.

These motions were timely filed by the respective parties and were decided by us on June 27, 1951, at which time we rendered no written opinion.

Appellee's motion to affirm on certificate is, of course, controlled by the propriety of our action in granting appellant's motion for an extension of time.

It is appellee's position that we erred in granting appellant's motion because "good cause", within the meaning of Rule 386, Texas Rules of Civil Procedure, was not shown by appellant for not having filed the record within the original sixty days allowed by the Rule.

The sworn motion of appellant alleged the following as constituting good cause for such delay:

"Immediately upon the over-ruling of the motion for new trial by the trial court, appellant ordered a statement of facts; and soon thereafter she requested the Clerk of the trial court to make up a transcript, and there was a delay in the preparation of the transcript due to the fact that the Clerk was out of the county a part of the time; and attorneys for appellant had as many as three long distance telephone conversations with the deputy in the office and with the Clerk upon her return with reference to the preparation of the transcript. There was also some delay in the preparation of the statement of facts, and an order was obtained extending the time for filing such statement of facts. However the statement of facts was filed in the office of the District Clerk of San Saba County, Texas, on June 8, 1951; and the transcript in said cause was finished and certified by the Clerk of the Court on June 8, 1951; and said transcript and statement of facts was sent to Woodruff and Holloway, attorneys for the appellant, by express, and was received a few days after June 8, 1951.

"R. R. Holloway, the member of said firm who had ordered the record, understood that upon said record being received at the office of Woodruff and Holloway, the secretary for said firm had delivered the transcript and statement of facts to the Railway Express Company to be delivered to the Clerk of the Court of Civil Appeals at Austin, to be filed in this court within the time provided by law and the rules of this court.

"S. W. Hughes and Sam McCollum, both of Brady, Texas, are also attorneys for appellant, Mattie Matlock, having participated in the trial of said cause and in the District Court and likewise participate in this appeal. On June 13, 1951, said S. W. Hughes, inquired of said R. R. Holloway with reference to the filing of the transcript and statement of facts in said cause in the Court of Civil Appeals; and the said R. R. Holloway advised said Hughes that said record had already been sent to the Clerk of the Court of Civil Appeals for filing. Thereafter on June 18, 1951, (the last day of the sixty day period) said Sam McCollum inquired of said Hughes as to whether the record in the case had been filed and said Hughes reported to said Mc-Collum that he had talked with said Holloway a few days prior thereto and that said Holloway had advised him that the record in the case had been sent to the Clerk of the Court of Civil Appeals.

"Realizing that he had not received from the Clerk of this court any notice of the receipt and filing of the record, said Holloway proceeded to investigate and learned on this, the 20th day of June, 1951, that through mistake and inadvertence, said record had not been delivered to said Railway Express Company for delivery to the Clerk of the Court of Civil Appeals."

The record was received by the clerk on the second day following the expiration of the original sixty days.

In our opinion those facts and circumstances are sufficient to constitute good cause. We believe that this rule should be construed and applied in a manner most favorable to the appellant. Parks v. Purnell, 135 Tex. 182, 141 S.W.2d 585. It is seldom of any material consequence to the parties, counsel or the court whether a record on appeal is filed two days late, as here, and in the absence of a showing of bad faith or careless indifference on the part of appellant we are satisfied that the

benevolent purpose of the rule was accomplished in granting and in not depriving appellant of the right of appeal.

The motion is overruled.

Motion overruled.