David Robert SPECIA, Appellant,

v.

Charles SPECIA et al., Appellees.

No. 12959.

Court of Civil Appeals of Texas.

San Antonio.

May 31, 1956.

Rehearing Denied July 11, 1956.

W. W. Fowlkes, Bobbitt, Brite & Bobbitt, San Antonio, for appellant.

Peter Briola, San Antonio, for appellees.

POPE, Justice.

This is an appeal by writ of error from a judgment which denied the probate of the will of Ben Specia, Sr., who died on June 30, 1953. A jury determined that Specia did not possess testamentary capacity. The first question in the case is whether the appeal by writ of error was perfected, and the second, whether the verdict of the jury is against the great weight and preponderance of the evidence.

Ben Specia, Sr., had five children, one by his first marriage and four by his second. His will was executed May 9, 1944, and by its terms he left $1,000 to Charles, his son by his first marriage; $500 to each of his daughters, Mary and Mabel, and the rest of his $300,000 estate, equally to his sons Ben and David. He named his son Ben Specia, Jr., and a friend, G. J. Lucchese, as independent executors. They made application for probate of the will. Charles Specia filed a contest to the original probate of the will. The will was admitted to probate in the County Court, but

denied probate in the District Court. The executors did not appeal. David Specia, one of the two major beneficiaries of the will, within six months, undertook to perfect this appeal by writ of error.

The original application for probate was filed by the two executors. The record shows that the contest was waged with the executors as proponents and Charles as the contestant. David did not appear in the trial, either in person or by attorney. Charles, the contestant, moves that David's appeal by writ of error be dismissed and relies upon art. 2249a Vernon's Ann.Civ. Stats., which states:

"No party who participates either in person or by his attorney in the actual trial of the case in the trial court shall be entitled to review by the Court of Civil Appeals through means of writ of error."

David, without question, had complete knowledge of the suit and was present in court during all of the trial. The statute, however, does not bar David if he has knowledge of the actual trial, but if he "participates" in the trial. Sitting in the court room without plea or pleading is non-participation instead of participation. It is argued that David could have intervened. Had he intervened, he would have participated; not having intervened, he did not participate. One who participates for the first time in a motion for new trial is held not to have participated in the actual trial, and the Supreme Court has stated that this statute should be liberally construed in favor of the right to appeal. Lawyers Lloyds of Texas v. Webb, 137 Tex. 107, 152 S.W.2d 1096. Even the filing of an answer in a proceeding, without further participation, does not bar the appeal. Certainly, one who files an answer has knowledge of the proceeding. Petroleum Casualty Co. v. Garrison, Tex.Civ. App., 174 S.W.2d 74.

David, as one of the main beneficiaries in the will under contest, was a party to the contest within the contemplation of Rule 359, though not personally named as a party. Waurika Oil Ass'n v. Ellis, Tex.Civ.App., 254 S.W. 1032; Security Trust Co. of Houston v. Roberts, Tex.Com.App., 208 S.W. 892. His substantial interests are involved in the appeal. David, in his petition for writ of error, named not only the contestant but all other persons named in and interested in the will. David properly perfected his appeal.

In seeking to uphold the will, David argues that the verdict of the jury is against the great weight and preponderance of the evidence. The Supreme Court in King v. King, 150 Tex. 662, 244 S.W.2d 660, discloses the function of Courts of Civil Appeals in the exercise of their constitutional powers to pass on that question. We are required to consider and weigh all of the evidence, not simply search the record to see if there be any evidence. In doing that we conclude that the verdict is against the great and overwhelming preponderance of the evidence.

In examining the record, it is well that we first define the thing for which we are searching. The sole issue before the jury was the testator's testamentary capacity. It was defined to mean, "that such person at the time of the execution of the will, must have sufficient mental ability to understand the business in which he was then engaged, the effect of his act in making the will, and the nature and extent of his property; he must be able to know his next of kin and the natural objects of his bounty and their claims upon him; he must have memory sufficient to collect in his mind the elements of the business about to be transacted and to hold them long enough to perceive at least their obvious relation to each other and to be able to form a reasonable judgment as to them." David argues that the great weight of the evidence shows that the testator possessed those qualifications.

Five persons testified that testator was of unsound mind, after stating their

own observations of testator's demeanor, habits, conduct, and mental condition over a long period of time. We consider the testimony itself as competent. 44 Tex.Jur., Wills, § 41; Jowers v. Smith, Tex.Civ.App., 237 S.W.2d 805; Walston v. Mabry, Tex. Civ.App., 225 S.W.2d 1014; Green v. Dickson, Tex.Civ.App., 208 S.W.2d 119.

To determine the question before us, we have examined in some detail the entire voluminous statement of facts. We find, generally, that the witnesses who testified that testator was of unsound mind, expressed their opinions about testamentary or mental capacity without the benefit of the court's, or any other, definition of that term. Mental capacity must be measured against some standard; but the court's standard, stated in the charge to the jury, was not explained to the witnesses when they were giving their conclusions. We deem it necessary to summarize the evidence.

Mrs. Hermenia Specia, the first wife of testator and the mother of Charles, the contestant, stated that testator could not keep his mind on one subject, thought everybody was against him, and was suspicious of her. She testified about that condition during the period between 1911 and 1916, when she was married to testator, and also connected that condition, in point of time, to 1944, the year testator made the will. Sometimes he would visit her home, and when she would speak to him he would not answer.

Mrs. E. V. Stewart, sister to testator's first wife, stated that testator, in conversations with her over a period of thirty years, would mumble words she could not understand, and would shift from one conversation to another before one was completed. He was drunk most of the time, over a period of twenty-seven years. There were times when he was not drunk, but he acted and looked drunk. She could never get any sense out of him. In her opinion he was of very unsound mind. He would consult her about his business, but she refused the advice, telling him that his brother Adolph ran his business. She would see him standing in front of his store, and "he was always drunk and stupid like * * *." He never discussed his property with the witness. The witness, when asked why he did not do so, replied, "Because I think he was of unsound mind and I do not think he knew how much he had." She arrived at that conclusion, however, after testator died and she learned the extent of his holdings. On one occasion in 1943, the witness went to the Specia store to purchase some things for her child, and testator stated he had a grandchild, but could not recall the name of his own daughter until reminded by the witness. She stated that in her opinion he did not have mental capacity to make a will. During 1943 testator told the witness he was going to make a will and leave everything to Charles. She told him it would be better to leave the property equally to his five children. In 1944, he told the witness he had followed her advice and left his property equally to the five. In fact, he had not done so.

Mrs. Juanita de Zepeda knew testator from 1940 until his death in 1953. He purchased fruit from her and her husband at their fruit stand. She saw testator several times each month. The witness stated that testator was sometimes well and sometimes he was not well. When asked to explain that statement, she stated that testator always carried a pistol. She asked him why he carried the pistol and he said he was carrying it for "the morena or prieta." She said a "prieta" is a dark looking woman. Sometimes witness could understand what testator was talking about and other times she could not. He was always biting one of his fingers. He looked queer. He was in an ugly mood, and she was afraid of him. He was dirty. He was not clean shaven. He was that way always. He was never well and he was not of sound mind. On cross-examination, she stated that she considered him of unsound mind from the way he looked at the witness and the way he talked. He always looked at her in a very ugly way, and she feared

him. Sometimes when he would bite his finger, it would bleed.

Thomas Zepeda, husband to Juanita Zepeda, stated he saw testator one or two times very week at various places, from 1933 to 1952. In their conversations, testator would sometimes refer to one thing and then suddenly bring up another. He wore dirty clothes. He stated: "Sometimes I could understand his conversations and sometimes I had to get away from him because to avoid having him spit in my face. * * * I could not understand him because he had nothing to base his conversation on. * * * He was not right in the way he talked, I thought he was sick in his head. * * * He wore his shirts three or four days and they were spotted with beer and food." Witness stated he noticed a change in testator about 1943 or 1944. That change was: "I could not understand what he was talking about. * * * According to my opinion he was a little sick at that time. I could not understand what he was talking about. According to my opinion, in fact, I really thought that he was losing his mind." In 1944, testator "was starting to get sick." On cross-examination, answering the inquiry as to when testator became "crazy," witness stated that in his opinion, testator was that way about eight or ten years before he died, but that he was more seriously sick the last two or three years before he died in 1953. Witness stated: "Well, the illness was progressive, you could understand less of what he said or what he talked, you could know that he was getting worse. He was very nervous and talked—nobody could understand him, and water came out of the side of his lips."

Drusilla Specia, wife of contestant, Charles Specia, testified that she met testator about 1949, just before she married Charles. Testator attended their wedding in a drunken condition and disturbed the guests by arguments concerning the merits of marriage compared with simply living together. She stated that in her many conversations with testator, from 1949 to the time of his death, she could not follow his conversations. She stated that testator told her he relied upon his brother Adolph in his business matters, but he once bought a potato chip factory without telling his brother, it went broke, and he was afraid his brother would find out about it. She related certain specific conversations with testator about marriage, the church and children, none of which had his general approval. "Well, he thought that men ought not to have to support their children, he thought the State ought to take care of the children." That was a favorite topic for discussion by testator. She stated that she thought testator was mentally deranged, "based on his conduct and his conversations and his actions." She stated that he was not coordinated properly. She said " * * if he would pick up something in his hand, he would just drop it all over you—oh, that is all, and his clothes, too." This witness did not meet testator until many years after the will was executed.

We now turn to the evidence that the testator was of sound mind. On the date the will was executed and for a long time before and after that date, testator was the managing partner of a large and successful plumbing and hardware business. His estate was valued at $300,000. On the same date he executed the will, he opened the store, planned and assigned the day's work and personally prepared work orders. At that time, though his two brothers were his partners in business, only the testator had the power to sign company checks. On that day, he signed thirty-five checks in payment of company bills. During all of 1944, and up to his death, he supervised the office, made job estimates, adjusted complaints, exercised economy, and the business continued to prosper. He tended to the income tax matters for the business.

On the date he executed his will and long thereafter, testator was treasurer for a fraternal benefit organization. On the same date he executed his will he executed

ten checks in payment of certain debts and benefits owing by the society. Testator, in addition to his business, had other financial interests in partnership with his brothers, especially in the form of real estate and rent property. He took the lead in handling rentals, because he was best informed about values. He was a competent land appraiser. He bought, sold, improved and rented his property. He made leases, collected rent, and selected tenants. He handled transactions with abstract firms, banks, realtors and tenants.

Testator was one of the incorporators of two different banks. He was a director for both of them in 1944 and until his death. During 1944, he was on the Finance Committee for one bank, and, according to unimpeached testimony, possessed a good memory, knew property and its values and passed on loans.

Several officials of two banks, an accountant, testator's partners, members of his family, real estate men, customers, long-time employees, business associates, fraternal members, and the president of an abstract company, all testified to long associations and satisfactory business relations with testator, extending over his entire lifetime. He was described as a successful business man with great business acumen. In point of time, his sound judgment on May 9, 1944, is especially proved.

The evidence about testator's drinking habits, his coherence, and his intelligibility was sharply disputed. The wide variance in the opinions of the witnesses is perhaps explained by one of testator's brothers, who stated that testator was successful in business and unsuccessful in marriage. In weighing all the evidence, we must test it against the court's definition of testamentary capacity. The evidence demonstrates that testator understood the nature and extent of his property. None of contestant's witnesses challenged his business ability, nor his capacity to engage successfully in a wide range of business affairs.

The evidence shows that he understood the nature of the business and contractual matters in which he was engaged, and the effect of his act in making the will. Ben, Jr., who was one of the major beneficiaries, was engaged in business with his father. The will named Ben, Jr., as executor, along with G. J. Lucchese, a competent business man and friend of long standing. The witnesses were friends and business associates of many years. P. T. Pfeiffer, once worked in the city tax office, and he became acquainted with the testator when he rendered his property regularly each year. Joe Lucchese, another witness, handled testator's real estate and made collections for him. G. J. Lucchese knew testator for twenty-three years and handled some of his real estate and investment matters. The three witnesses testified that he was sound on the day he executed the will in the Lucchese real estate office, that shortly thereafter he made several first-class loans of money and other sound investments. The will was prepared in April, but Specia delayed executing it until May 9, when all the witnesses could be present. There is nothing to indicate that testator did not carefully consider the will itself. The will is well-prepared and well-witnessed. For nine years after the execution of the will, testator left it unchanged.

Not only did testator know his next of kin and the natural objects of his bounty; he named every one of them in his will. Even among contestant's witnesses only one testified about a single instance when testator momentarily was unable to call the name of a daughter.

The time of the occurrences testified about is of importance. The record shows overwhelmingly, by witnesses and documents, that testator was competent on May 9, 1944. The evidence of incompetency loses its strength when we examine it against the standard of the definition as stated in the court's charge.

A considerable number of will cases leads us to the conclusion that courts have mani-

fested no hesitancy to reverse a case even where stronger proof of incompetency is present. In re Boultinghouse's Estate, Tex. Civ.App., 267 S.W.2d 614; Bell v. Bell, Tex.Civ.App., 248 S.W.2d 978; Matlock v. Matlock, Tex.Civ.App., 245 S.W.2d 536; Cruz v. Prado, Tex.Civ.App., 239 S.W.2d 650; Bell v. Bell, Tex.Civ.App., 237 S.W. 2d 688, 689; Garcia v. Galindo, Tex.Civ. App., 189 S.W.2d 12 (citing cases); Stell v. Salters, Tex.Civ.App., 83 S.W.2d 742; In re Bartels' Estate, Tex.Civ.App., 164 S.W. 859.

The judgment is reversed and the cause remanded.