Charles SPECIA, Appellant,

v.

G. J. LUCCHESE et al., Appellees.

No. 3377.

Court of Civil Appeals of Texas.

Eastland.

April 18, 1958.

Rehearing Denied May 9, 1958.

Peter Briola, Putman, Putman, Strong, Reid, Murray & Taylor, San Antonio, for appellant.

Park Street, Walter Powell Gray, Hugh J. Fitz-Gerald, Bobbitt, Brite & Bobbitt, James C. Onion, Leonard Brown, San Antonio, for appellee.

WALTER, Justice.

Appealed from the 131st District Court of Bexar County.

This is the second appeal of this will contest case. Ben Specia, Sr., died on June 30, 1953, leaving a will dated May 9, 1944, and by its terms he made Ben Specia, Jr., and G. J. Lucchese independent executors and bequeathed $1,000 to Charles Specia, a son by his first marriage, and $500 to each of his daughters, Mary and Mabel, and the residue of his estate was left to his son Ben Specia, Jr., and David Specia, share and share alike. The probable value of the estate was alleged to have been in excess of $400,000.00 in contestant's first amended petition. Charles Specia was contestant and Ben Specia, Jr., and G. J. Lucchese, independent executors and Mabel Specia Wolfe, Mary Specia Anderson and Effie Beckett Specia were the proponents of the will.

The will was admitted to probate in the county court but in the district court probate was denied at the first trial because the jury found that Ben Specia, Sr., did not have testamentary capacity. An appeal by writ of error was taken from the first judgment to the Court of Civil Appeals at San Antonio which reversed and remanded the case, 292 S.W.2d 818, because the verdict was against the great weight and preponderance of the evidence.

In the case at bar the contestant pleaded and introduced competent evidence that Ben Specia, Sr., did not have testamentary capacity at the time he executed his will. This issue was submitted to a jury which was unable to agree on a verdict. The court discharged the jury and, upon re-

consideration of a motion for an instructed verdict by the proponents, came to the conclusion that it would have been proper to have withdrawn the case from the jury and instructed a verdict for the proponents. The court accordingly admitted the will to probate and overruled the contestant's motion for mistrial.

From this judgment the contestant has duly perfected his appeal on one point of error, namely, the trial court erred in withdrawing the case from the jury and rendering judgment for the proponents because there was sufficient evidence to raise a fact issue of lack of testamentary capacity of the testator.

If there was any evidence of probative force that Ben Specia, Sr., did not have testamentary capacity, the court should not have granted the proponents' motion. On the question of authority of the trial court to instruct a verdict, our Supreme Court in Air Conditioning, Inc., v. Harrison-Wilson-Pearson, 151 Tex. 635, 253 S.W.2d 422, 425, speaking through Justice Sharp, said:

"The courts of this State have repeatedly held that it is error to instruct a verdict when the evidence raises any material issue. In passing upon the question of the authority of the trial court to instruct a verdict, as was done in this case, the evidence must be considered most favorable in behalf of the party against whom the verdict is instructed. A peremptory instruction is warranted only when the evidence is such that no other verdict should be rendered. If there is any conflicting evidence in the record of a probative nature, a determination of the issue is for the jury. White v. White, 141 Tex. 328, 172 S.W.2d 295; Stevens v. Karr, 119 Tex. 479, 33 S.W.2d 725."

After a careful study and analysis of the evidence in this record, we have reached the conclusion that there was some evidence of probative force that Ben Specia, Sr., did not have testamentary capacity.

In considering if there was a jury question on the issue of testamentary capacity, the court in Venner v. Layton, Tex.Civ. App., 244 S.W.2d 852, 856, said:

"This being an original application to probate the will, and the testator having changed the statutory rule of descent and distribution, put upon those who offer the will for probate the burden of proving its execution under and in compliance with all the formalities set out in our statutes, one of which was that the testatrix had testamentary capacity at all material times.

"'In considering the question as to whether there was a jury question on the issue of testamentary capacity, only evidence favorable to a finding for appellants can be considered. Such evidence considered, while it need not be a preponderance of the evidence, must consist of more than a scintilla or a suspicion; it must have substance."

We find at least four of the witnesses who were called by the contestant in the case at bar who were also used by him when the case was tried the first time. Referring to contestant's witnesses in the first trial the Court of Civil Appeals said:

"Five persons testified that testator was of unsound mind, after stating their own observations of testator's demeanor, habits, conduct, and mental condition over a long period of time. We consider the testimony itself as competent. 44 Tex.Jr., Wills, § 41; Jowers v. Smith, Tex.Civ.App., 237 S.W.2d 805; Walston v. Mabry, Tex. Civ.App., 225 S.W.2d 1014; Green v. Dickson, Tex.Civ.App., 208 S.W.2d 119." Specia v. Specia, 292 S.W.2d 818, 819.

Mrs. Herminia Specia was called as a witness by the contestant, who testified that she had married Ben Specia, Sr., in 1911, was divorced from him in 1916 and that to said marriage union was born one

child, Charles Specia, the contestant herein. She testified that from the time she was divorced from the testator up until the time of his death in 1953, he came over to her house twice a week. She recalled that in the year 1944, sometimes the testator visited her about three times a week.

She testified that in 1940 on one of his visits to her home he told her that everybody was against him and that the Government was after him. He also related that when he rode over to her house on the bus a soldier got off of the bus when he did and followed him to her house. He thought someone was sending the Government after him. She related that in 1943, while testator was visiting her she made some lemonade and gave it to him and he poured the lemonade on his head and threw the glass at her.

In 1944 she testified that Ben Specia, Sr., was at her home nearly every day and wanted to marry her again and said that he would keep Effie and have them both. He told her that he had made a will and left equal shares to his five children. In less than five minutes after telling her this, he asked her what was the name of their son. After telling him the name of their son, he then asked her how many children he had. After informing him he had five children and giving him the names, he said, "You are lying to me. I have more." He asked about little Minnie and Alice and wanted to know where they were. After telling him they had only the one child, he again wanted to know where the girls were, and told her she was lying to him and wanted to see the girls. When he came to visit her, he was always telling her everybody was against him and the Government was after him. She testified that in her opinion Ben Specia, Sr., was of unsound mind in May 1944.

Mrs. E. V. Stewart was called as a witness by the contestant and she testified that she had known Ben Specia, Sr., from about 1911 up until the time of his death. She related that during the years from 1940 to 1950 she saw him two or three times a week. She would see him at Christopher Columbus Hall and other places. Sometime in 1943, she testified that she was going to a dressmaker that was close to the Italian Hall and saw the testator standing on the corner with a bag of eggs, and when asked what he had he replied that he had some eggs and that he was going to throw them on the priest. He told her that Adolph was short $5,000 at the store and the priest had it. He accused Adolph's wife of giving the money to the priest. Mrs. Stewart thought the testator was crazy because nobody but a crazy man would want to throw eggs at a priest.

Sometime in 1945 she saw the testator by the Santa Rosa Hospital seated on a rock fence, and he told her he was waiting for one of his daughters but could not remember which one and started looking in his shirt pocket for her name but could not find it. After looking in all of his pockets, he pulled off his shoes and turned them upside down and talcum powder blew all over her dress. This was in front of the Santa Rosa Hospital. She related that the same thing happened over by the Houston Building when he could not remember his daughter's name. She related that in 1942, she had conversations with the testator in which he would stray off to another subject before he finished what he was trying to tell her. These conversations took place at the Italian Hall in the basement and nearly every time she talked to him he would stray off. She related that the condition was the same in 1943 and 1944. She testified that in her opinion the testator was of unsound mind in 1944.

Mrs. Juanita Zepada was called as a witness by the contestant and testified she had known the testator from 1941 until his death. She stated that in 1942 she saw him sometimes every eight days and sometimes every two weeks and sometimes every three weeks and during the year of 1943, she saw him ten or twelve times. In 1944 she saw him two or three times. She met him at her fruit stand which was in front of Mr.

Tafolla's barber shop. He related to her in 1941 or 1942 that he was having some papers fixed up in order to leave equal parts to his children. In 1942 or 1943, he talked to her at her place and told her he was going to kill the *"prieta"*, dark one, and that he was carrying a gun. He related this to her several times during those years. In 1943, he related to her that someone was coming after him and she told him that she did not see anybody. She testified that during the years she knew Ben Specia, Sr., he was not in "his normal way" and would spit on people when he was talking to them. In 1942 and 1943 she saw and heard him at her fruit stand talking and laughing by himself and his mouth was watering and he was never clean. He claimed someone was following him, that some officer was following him and the Government was following him. He ate at her place and talked to himself, and she was afraid of him when she saw him talking to himself.

In 1944 he told her he had fixed up the papers to leave his children equal parts. During that year she also saw him talking and laughing to himself and complaining that someone was following him. He also told her in 1944 that he was going to kill the *"prieta"*, the blackie. Also during the same year at her place of business he poured a cup of coffee into his shoe. He also bought some tortillas from her and gave her a penny and when she told him he had not paid for them he insisted that he had and told her to keep the change and left without paying her. When he got hold of the shoe to drink the coffee, he was asked, "Mr. Specia, where are you going to drink the coffee?" He said, "In the cup." She testified that the testator was not "in his normal way".

We do not deem it necessary to burden this opinion with further detailed account of the evidence other than to say that after reading it we are convinced that the other witnesses who expressed an opinion that the testator was of unsound mind first testified to sufficient facts to justify such an opinion. From the testimony detailed above and the other evidence in the record, we find there was some evidence of probative force that the testator did not have testamentary capacity at the time he executed his will.

When a motion for instructed verdict should and should not be given is set forth in 41b, Tex.Jur., page 222 as follows:

"If a party introduces sufficient evidence to support a verdict in his favor, he is entitled to have the question submitted to a jury if one is demanded. A peremptory instruction for a directed verdict is warranted only where there is no testimony of probative force in favor of the losing party or when the evidence is such that no other verdict can be rendered and the winning party is entitled, as a matter of law, to a judgment. A distinction is to be made between cases where there is no evidence except that which certainly establishes given facts and those where there is some evidence tending to support a finding of different facts; a verdict may be directed in the former class of cases but never in the latter class, even though the court deems the evidence slight and insufficient to support a different verdict. Existence of any evidence, even though insufficient to warrant a finding upon a designated issue precludes the granting of a motion for an instructed verdict on the ground of insufficiency of evidence."

Also in 41b, Tex.Jr., 226, we find the following:

"When the evidence, though it leaves little doubt as to the facts, is open to different material and decisive conclusions or inferences which may properly be drawn from it, the case should always go to the jury, and every unfavorable inference is against the motion. If on the case made the jury might draw diverse inferences, some against the motion and proposed ver-

dict, the case must be submitted to them. If there is any evidence it must be taken in its most favorable light in favor of the adverse party and against the motion or request."

The Appellant's point of error is sustained and the judgment of the trial court is hereby reversed and the cause is remanded for a new trial.